UNITED STATES OF AMERICA
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA for the use and benefit of CONCRETE PLACEMENT, INC. and CHEROKEE CONSTRUCTION, INC.

VS. C.A. NO. 05-480S

ST. PAUL FIRE & MARINE INSURANCE CO.

DEPOSITION OF LOUIS FRESOLONE, CHEROKEE CONSTRUCTION, a Plaintiff in the above entitled cause, taken on behalf of the Defendant, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Little Medeiros Kinder Bulman & Whitney, PC, 72 Pine Street, Providence, Rhode Island, on January 11, 2007, at 2:50 P.M.

APPEARANCES:

FOR THE PLAINTIFFS......CHARLES S. KIRWAN & ASSOCIATES
BY: CHARLES S. KIRWAN, ESQUIRE

FOR THE DEFENDANT.......LITTLE MEDEIROS KINDER BULMAN & WHITNEY, PC
BY: MICHAEL D. WILLIAMS, ESQ.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

INDEX

WITNESS PAGE

LOUIS FRESOLONE

EXAMINATION BY MR. WILLIAMS................3

EXHIBITS

(DEFENDANT'S)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| A | MEMO TO NATALE FROM RICCI, 3-2-05, WITH ATTACHMENTS, 7 PGS........................ | 18 |

FOR INSTRUCTIONS TO WITNESS, SEE PAGE 34

(DEPOSITION COMMENCED AT 2:50 P.M.)

LOUIS FRESOLONE

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Would you state your full name for the record, please.

THE WITNESS: Louis Fresolone.

MR. WILLIAMS: Before I start, Attorney Kirwan, we'll agree to the stipulations we agreed to prior to in the previous deposition?

MR. KIRWAN: Yes, sir.

EXAMINATION BY MR. WILLIAMS

Q. Mr. Fresolone, my name is Michael Williams, I'll be asking you a few questions today. I think your attorney will agree you're here on behalf of a Rule 30(b)(6) deposition served on Cherokee Construction, correct?

MR. KIRWAN: Say yes.

A. Yes.

MR. WILLIAMS: Either one of you. I don't care which one.

Q. Are you under the influence of any substance today that may impair your testimony?

A. No.

Q. Have you ever been deposed before?

A. Yes.

Whiting-Turner.

Q. Was it always the same representative from Whiting-Turner?

A. No.

Q. Do you remember some of the names of the people who you communicated with from Whiting-Turner?

MR. KIRWAN: Why don't you say this, until you say something else, he's just talking about the Combo Gates project.

MR. WILLIAMS: Right.

THE WITNESS: You're bouncing around.

MR. WILLIAMS: The rest of the deposition is entirely restricted to the combo project.

MR. KIRWAN: He's tricky, Louie. Those vague questions will get you.

Q. Just for the record, and unless I say otherwise, these questions only pertain to the Combo Fire project. So, on the Combo Fire project do you remember any of the names of the Whiting-Turner representatives with whom you verbally communicated with?

A. Mr. Larry Eager, Mr. Andrew Natale, and I believe there was a superintendent for Whiting,

I'm not sure of the gentleman's name.

Q. Now, I asked you about the Miller Act and the Miller Act notice requirements before. In regards to the Combo Fire project, are you aware of the first day that you gave notice to Whiting-Turner that you were going to assert a claim under the Miller Act?

A. I believe it was in January, beginning of January; the date right now is unclear.

Q. This is 2005 or 2006?

A. That would be in 2005, I believe, because the work was performed in '04.

Q. Was this notice verbal or written?

A. Verbal.

Q. Do you remember who you talked to on that day?

A. I believe I spoke to Mr. Andrew Natale.

Q. Do you remember the substance of that conversation?

A. I just asked Andrew if I could have bond information for lack of payment on that project.

Q. When you say lack of payment, what do you mean?

A. Well, the work was performed in November of '04, I believe. January '05, I mean, that's a substantial amount of time to be paid.

Q. Who is responsible for paying you on Combo Fire,

which entity was responsible for paying Cherokee on Combo Fire?

A. Cherokee was a second tier sub for Capital City Concrete.

Q. So it was -- Cherokee was a second tier sub that contracted directly with Capital City Concrete, correct, or were they a second tier sub for Capital City Concrete?

A. Clarify. Cherokee was working for Capital City Concrete.

Q. Directly?

A. Directly.

Q. So, contractually, it was Capital City Concrete who was supposed to be paying Cherokee on the Combo Fire project?

A. Right.

MR. KIRWAN: Objection. You can answer.

MR. KIRWAN: He said yes.

A. Yes.

Q. During that conversation with Mr. Natale in January of '05, you said you asked him for his bond information?

A. I believe I brought it to his attention that we weren't paid on the project, and he spoke to me

about he would look into that.
Q. So in that conversation you informed Mr. Natale that you were not paid on the project and you asked him for the bond information, is that an accurate description of what that conversation contained, in your opinion?
A. I believe so. Yes.
Q. During that conversation in January of '05, did you tell Mr. Natale that Cherokee may be asserting a direct claim against Whiting-Turner or Whiting-Turner's bonding company?
A. No, not at that time.
Q. Moving on from that initial conversation in January 2005. Did you have any other subsequent conversations with either Mr. Natale or anybody else from Whiting-Turner about the fact that you weren't being paid on the project?
THE WITNESS: Would that be prior or after?
Q. After that. It's my assumption that you testified that that was the first time that you provided notice that you had a claim under the Miller Act. I want to know if there were subsequent conversations that you addressed that topic?
A. Yes.

Q. And when did those other conversations occur?

A. I believe it was in February.

Q. Of 2005?

A. Correct.

Q. And who were those conversations with?

A. Andrew Natale, Beth Leslie, and I believe the gentleman's name is Matt Belka (phonetic) for Whiting.

Q. I assume this is more than one conversation that you're referring to in February of 2005?

A. Yes.

Q. If you can, and I don't know if you remember or not, but could you summarize basically, first of all, can you state how many conversations did you have in February of 2005 regarding your intent to bring a claim under the Miller Act?

MR. KIRWAN: Regarding the Combo Gates project?

MR. WILLIAMS: Yes. Every question I ask is on Combo Fire.

Q. Do you know how many different conversations you had in February of '05 with Whiting-Turner personnel?

A. That's tough, that's a tough question because I was involved with the Gates project as a second

25th, 2005 from Charles S. Kirwan to Andrew Natale; Number 98 is a document entitled Partial Waiver and Release For Second Tier Subcontractors and Suppliers, which I do believe was attached to the March 25th, 2005 letter, and document bearing the number 99 in the bottom right-hand corner is a certified mail receipt; and the document bears the number 100 in the bottom right-hand corner is the return receipt which appears to be signed by somebody at Whiting-Turner on a date of, I believe that says March -- I'm not really sure what date that says, unfortunately. I think it says April 20th; it's difficult to read.

MR. KIRWAN: I think we can probably stipulate, I believe that it's 4-20.

Q. Mr. Kirwan received it originally, so we can stipulate to April 20th. Mr. Fresolone, have you seen this letter before?

A. Yes.

Q. Outside of any discussions with counsel regarding the case that we're here for, when have you seen this?

A. This was brought to my attention. I wrote some of this with my counsel at that time.

Q. At that time, meaning around the date of March 25,

2005? I assume it would be before that date.
A. It would be before that, just prior to.
Q. The week leading up to it, perhaps?
A. Perhaps.
Q. Now, without getting into anything that you may have discussed with your counsel, did you -- do you understand what the reason was behind sending this letter?
A. The reason for this was acting on the Miller Act bond for lack of payment on that project.
Q. Before you sent this letter, and not including any of the conversations that we've addressed that occurred in January and February of 2005, did you have any conversations with Whiting-Turner in March of 2005 before you sent this letter -- I'm sorry, before your counsel sent this letter?
A. I believe so.
Q. Do you remember the substance of those conversations?
A. No, I don't.
Q. Do you remember how many you may have had regarding the Combo Fire project?
A. No, I don't. Because it was running in conjunction with the child day care project.
Q. Before the date of this letter, March 25, 2005,

did you verbally inform Whiting-Turner that you were going to bring a lawsuit against either them or their bonding company?
A. I believe so, yes.
Q. Do you remember when you did that?
A. It was probably around that time of February or March.
Q. But you're not sure whether it occurred in February or March?
A. No, I'm not because, like I said, we were working in conjunction strictly for Whiting-Turner on child day care and this had to do with work performed as a second tier sub on the Gates project.
Q. Do you have any kind of records or internal memorandum that keep track of the conversations that you had with Whiting-Turner on Combo Fire?
A. No.
Q. The lien, the partial waiver and release that has the number 98 in the bottom right-hand corner Bates stamped, do you under -- is it your understanding that partial waiver and release was included with the March 25, 2005 letter?
A. Yes.
Q. And is this the document that you were referring

to earlier on in your testimony?

MR. KIRWAN: The waiver you were referring to?

A. Yes.

Q. I understand there's some dispute as to the accuracy of your signature on this partial waiver and release, correct?

A. That's correct.

Q. You said you assisted your counsel in writing part of this letter, without getting into any kind of direct communications with your counsel, can you please inform me as to what parts of the letter you assisted with?

MR. KIRWAN: I'm going to object. It was based on what he already said, it was a joint effort. I think it's very hard for you to ask questions without invading the privilege. If you want to take a break and talk about it, or if you want to refine a few questions, but I don't want to waive the privilege.

Q. I understand that. Let me try this question then.

MR. KIRWAN: I just want to instruct Mr. Fresolone to slow down on the topic of anything that may pertain to attorney/client communications so I have an opportunity to object.

partial waiver and release document at CHEROKE-98 in Exhibit A, other than the letters we addressed as part of Exhibit A and other than the oral communications that you've already addressed in this deposition that occurred in January, February and March of 2005, were there any other notices to Whiting-Turner or its bonding company that you were going to bring a claim under the Miller Act regarding the Combo Fire project?

A. I don't believe so.

Q. Eventually, the reason why this lawsuit is active today is because you were not paid the money that you were demanding; is that correct?

A. That's correct.

MR. WILLIAMS: I have no other questions in regard to the Miller Act notice. I reserve the right to bring Mr. Fresolone back on other topics.

MR. KIRWAN: I need a quick break.

(RECESS)

THE REPORTER: Do you need a copy of this?

MR. KIRWAN: Yes, I probably need it.

(DEPOSITION CLOSED AT 3:36 P.M.)