UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

U.S. ex rel. CONCRETE PLACEMENT, INC.
and CHEROKEE CONSTRUCTION, INC.

v. C.A. No. 05-480S

ST. PAUL FIRE & MARINE INS. CO.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I . INTRODUCTION

Pursuant to Fed R. Civ. P. 56(c) and 40 U.S.C. § 3133(b)(2), Plaintiff Cherokee Construction Inc. ("Cherokee") hereby submits its Memorandum in Opposition to Defendant St Paul's pro forma motion for partial summary judgment as to the Count III. Count III presents Cherokee's $33,284.20 Miller Act bond claim regarding the Combo Fire Station and Gates construction Project on the Newport Navy Base (hereinafter the "Combo Fire Project"). Defendant's pro forma summary judgment motion regarding Count III relies on the false premise that St Paul's bonded principal, Whiting-Turner Contracting Company ("Whiting-Turner") did not receive timely and adequate Miller Act bond claim notification.

This Memorandum delineates the uncontroverted controlling facts on the record in this case that force denial of Defendant's pro forma motion for partial summary judgment. Indeed, controlling documents produced by the Defendant not only conclusively defeat this pro forma defense motion, but also affirmatively establish, as a matter of law, that Cherokee timely provided actual notice of its Miller Act bond claim to the bonded construction manager, Whiting-Turner, in a timely, complete and effective manner that caused Whiting-Turner to withhold from subcontractor Capital City Concrete the contract proceeds sought by Cherokee's Count III Miller Act bond claim. In addition to Defendant's fatal documentary admissions

highlighted herein, the uncontroverted sworn affidavit averments of Louis Fresolone, Cherokee's Vice President, further confirm the uncontroverted fact that Cherokee, as a matter of law, timely, fully and effectively satisfied all applicable Miller Act notice requirements.

## II. FACT SUMMARY

Cherokee incorporates herein by reference its Statement of Disputed and Undisputed Facts (hereinafter, "Plaintiff's Statement") filed herewith, including the supporting Affidavit of Mr. Fresolone and the supporting Exhibits attached thereto. Defendant's Motion for Partial Summary Judgment as to Count III is misleadingly and woodenly premised on the baseless contention that Cherokee did not provide timely and adequate notice to Whiting-Turner in the role of the bonded construction manager on the Combo Fire Project.

November 19, 2004 was Cherokee's last day of work on the bonded Combo Fire Project as a second tier subcontractor to first tier subcontractor Capital City Concrete. Def.'s Statement at ¶ 6; Fresolone Aff. ¶ 4. Accordingly, February 17, 2005 stood as Cherokee's ninety-day Miller Act claim notification deadline applicable to the contested Count III Miller Act bond claim. Id.

On or about November 30, 2004, after finishing work on the Combo Fire Project on November 19, 2004, Mr. Fresolone prepared Cherokee's invoice to Capital City Concrete in the amount of $33,284.20 and sought payment from Capital City Concrete. Fresolone Aff. ¶ 6. Because Capital City Concrete did not promptly pay Cherokee's invoice dated November 30, 2004, Mr. Fresolone visited Whiting-Turner's on-site office trailer on a number of occasions during January and February 2005 and met in person to pursue payment with Andrew Natale, Whiting-Turner's assistant project manager for the Combo Fire Project. Fresolone Aff. ¶ 7.

As the result of Mr. Fresolone's efforts to secure payment from Whiting-Turner, Whiting Turner generated its own contemporaneous Miller Act claim management documentation. Whiting Turner's own contemporaneous Miller Act claim management documentation concerning the demands for payment on its unpaid invoice for Combo Fire Project that Cherokee made before the February 17, 2005 Miller Act 90-day notice deadline unavoidably forces summary denial of the Count III motion for partial summary judgment. Whiting-Turner's letter to Capital City Concrete dated February 20, 2005 (Whiting-Turner document no. WTCC 0036) confirms and describes some of the efforts taken by Mr. Fresolone before the February 17, 2005 Miller Act claim notice deadline to secure payment for Cherokee's unpaid invoice from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete.

The letter from Whiting-Turner to Capital City Concrete dated February 20, 2005 in part states:

> On Wednesday February 2, 2005 and two times thereafter, Louis Freselone [sic], Vice President of Cherokee Construction (subcontractor of Capital City Concrete), approached The Whiting-Turner Contracting Company regarding payment for work performed in November 2004. Mr. Freselone [sic] claimed that no payment has been made for a $35,000.00 invoice submitted at the end of November 2004…
>
> … Payments will not be made to Capital City Concrete until proper closure is made to this issue. It is Whiting-Turner's understanding that Cherokee Construction will no longer perform work under this contract. If this is the case please provide a final release of liens from this subcontractor in a timely fashion.[1]

See Whiting-Turner document no. WTCC 0036, attached to the Fresolone Aff. as Exhibit 2. Fresolone Aff. ¶ 14.

---

[1] Because Cherokee's invoice for the Combo Fire Project in the amount of $33,284.20 remains unpaid, no representative of Cherokee ever signed a final release of liens, a release of liens, a partial waiver and release, or any other waiver or release of any description regarding the Combo Fire Project. Fresolone Aff. ¶ 15.

It is uncontroverted that Mr. Fresolone was away on an out-of-state vacation during the period from on or about the afternoon of Wednesday, February 16, 2005 through Saturday, February 26, 2005, and did not contact anyone from Whiting-Turner about payment of the unpaid invoice for the Combo Fire Project during that vacation period. Fresolone Aff. ¶ 9. Accordingly, all of Mr. Fresolone's communications with Whiting-Turner personnel as described in the letter from Whiting-Turner to Capital City Concrete dated February 20, 2005 necessarily occurred before the ninety-day, February 17, 2005, Miller Act claim notification deadline. Id.

Whiting-Turner's letter dated February 20, 2005 plainly confirms that Mr. Fresolone's communications with Whiting-Turner before the February 17, 2005 Miller Act 90-day notice deadline put Whiting-Turner on notice that Cherokee intended to secure payment from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete for the work supplied by Cherokee regarding the Combo Fire Project. See Whiting-Turner document no. WTCC 0036, attached to the Fresolone Aff. as Exhibit 2. Fresolone Aff. ¶ 16.

In addition, it is wholly uncontroverted that on at least one of Mr. Fresolone's visits to the Whiting-Turner office trailer during February 2005 before Mr. Fresolone's February 16-26, 2005 vacation, Mr. Natale introduced Mr. Fresolone to Whiting-Turner Project Manager Matthew Belcher, at which time they discussed Mr. Fresolone's efforts to secure payment of Cherokee's unpaid invoice on the Combo Fire Project from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete. Fresolone Aff. ¶ 12. At that time, Whiting-Turner's representatives seemed to accept Mr. Fresolone's statements concerning Cherokee's unpaid invoice to Capital City Concrete for the Combo Fire Project and specifically informed Mr. Fresolone that it was Whiting-Turner's intention to withhold sufficient funds from progress

payments then owed to Capital City Concrete to make sure that all of Capital City Concrete's subcontractors, including Cherokee, were properly paid. Id.

Attached to the Fresolone Affidavit as Exhibit 1 are Whiting-Turner document nos. WTCC 0031-0032 produced in the course of discovery in this action. The first page WTCC 0031 is a Whiting-Turner internal accounting form entitled "Accounts Payable – Special Instructions" dated March 3, 2005 that bears the hand written notation: "Capital City Concrete – December 2004 Invoice, Hold by W-T (Whiting-Turner) for Cherokee Payment Issue" together with the subject Capital City Concrete – December 2004 Invoice dated December 30, 2004. Fresolone Aff. ¶ 12. The second page of Exhibit 1 (WTCC 0032) is the $39,900.83 invoice that Capital City Concrete submitted to Whiting-Turner on December 30, 2004 for payment for the work duly completed by Cherokee[2] on the Combo Fire Project during November 2004. See Exhibit 1, page two, attached to the Fresolone Aff. Id.

In addition to the facts recited above, in a number of additional different conversations during February 2005 prior to Mr. Fresolone's February 16-26, 2005 vacation, and therefore before the February 17, 2005 ninety-day Miller Act claim notification deadline, Mr. Fresolone made it clear to Mr. Natale that Cherokee wanted the payment bonding information[3] for the project and that Cherokee intended to secure payment of the unpaid invoice for the Combo Fire Project

[2] Cherokee's invoice for the Combo Fire Project in the amount of $33,284.20 is dated November 30, 2004 and remains unpaid. Fresolone Aff. ¶ 15.

[3] Despite the verbal requests that Mr. Fresolone made to Whiting-Turner for payment bond information before Mr. Fresolone's February 16-26, 2005 vacation, and despite the written request that Mr. Fresolone made for bond information on March 2, 2005, Whiting-Turner did not provide Cherokee the requested bond until on or about March 14, 2005. In this regard, note the following statement included in Whiting-Turner's letter to Capital City Concrete dated March 2, 2005 (see Whiting-Turner document no. WTCC 0040): "Whiting-Turner is legally bound by the Miller Act to provide this bond information to Cherokee Construction in a timely fashion upon written request." Whiting-Turner document no. WTCC 0040 is attached as Exhibit 3 to the Fresolone Aff. ¶ 17.

from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete. Fresolone Aff. ¶ 10. In at least one of Mr. Fresolone's meetings with Mr. Natale during February 2005 before Mr. Fresolone's February 16-26, 2005 vacation, during discussion of Cherokee's unpaid invoice, Mr. Fresolone showed Mr. Natale Cherokee's unpaid invoice to Capital City Concrete for the Combo Fire Project. Fresolone Aff. ¶ 11.

Consistent with all Miller Act notice requirements, based upon Cherokee's timely and fully effective claim notice to Whiting-Turner prior to February 17, 2005, Whiting-Turner was able to preserve and actually did preserve the payment status quo pending resolution of any pertinent payment disputes Whiting-Turner, Capital City Concrete and Cherokee. Id. The Whiting-Turner "hold payment" accounting form, read together with Whiting-Tuner's above-quoted letter to Capital City Concrete dated February 20, 2005 stands as independent, conclusive, controlling proof, confirming Mr. Fresolone's sworn affidavit averments, that Cherokee timely and fully satisfied all applicable Miller Act notice requirements with respect to the Miller Act bond claim set forth in Count III. Id.

The Defendant's partial summary judgment papers materially mischaracterize and inappropriately try to take Mr. Fresolone's deposition testimony out of context regarding the efforts, documented in part by Whiting-Turner's letter dated February 20, 2005, that Mr. Fresolone took on behalf of Cherokee during February 2005 before his February 16-26, 2005 vacation to put Whiting-Turner on notice that Cherokee intended to secure payment from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete. See ¶¶ 12-14 of Def.'s Statement as specifically disputed at length in Plaintiff's Statement of Undisputed Facts ¶¶ 18-21. In this regard, it should be noted that during Mr. Fresolone's forty-six (46) minute deposition (see deposition cover page and final page, Exhibit 4, Fresolone Dep.

35:25), Mr. Fresolone testified regarding two specific conversations that occurred during February 2005, but he was not asked if he recalled any other specific conversations that occurred during February 2005 with respect to Cherokee's efforts to secure payment for Cherokee's unpaid invoice from Whiting-Turner or the payment bond. See Exhibit 4, Fresolone Dep. 16:14-18:11. Fresolone Aff. ¶ 20. Rather than exhaust the topic of all conversations that Mr. Fresolone had with Whiting-Turner personnel in February 2005 prior to the February 17, 2005 Miller Act 90-day notice deadline, other topics were pursued.

During Mr. Fresolone's deposition he was not questioned about any of the following Miller Act events that occurred during February 2005 before Mr. Fresolone's February 16-26, 2005 vacation that now stand on this record as wholly uncontroverted facts (see Fresolone Aff. ¶ 20): no questions were asked regarding whether he provided Whiting-Turner personnel a copy of the unpaid invoice on or before February 17, 2005; no questions were asked if he had requested bond information again in February 2005 on or before February 17, 2005 after Cherokee's initial requests in January 2005; no questions were asked regarding what he had communicated to Whiting-Turner personnel during February 2005, on or before February 17, 2005, about Cherokee's intention to secure payment from Whiting-Turner or the payment bond if payment was not forthcoming from Capital City Concrete; and even though the letter from Whiting-Turner to Capital City Concrete dated February 20, 2005 states: "On Wednesday February 2, 2005 and two times thereafter, Louis Freselone [sic], Vice President of Cherokee Construction (subcontractor of Capital City Concrete), approached The Whiting-Turner Contracting Company regarding payment for work performed in November 2004", Mr. Fresolone was not asked any specific questions about what happened on February 2, 2005, nor was he asked any questions about the two (or more) other occasions during February 2005 before he left for vacation on February 16,

2005 in which Mr. Fresolone communicated with Whiting-Turner personnel regarding payment for work Cherokee performed on the Combo Fire Project in November 2004. See Whiting-Turner document no. WTCC 0036, attached to the Fresolone Affidavit as Exhibit 2. Fresolone Aff. ¶ 20.

Rather than address any of the specific, timely and completely effective Miller Act claim notices that Mr. Fresolone communicated to Whiting-Turner personnel prior to the February 17, 2005 Miller Act 90-day notice deadline, as established by Whiting-Turner's letter dated February 20, 2005, the Defendant's stilted and materially inadequate Statement of Undisputed Facts skips over Whiting-Turner's own contemporaneous Miller Act claim management documentation. Instead of addressing these controlling Miller Act notice facts and documents, Mr. Fresolone was question regarding whether and when he verbally informed Whiting-Turner that Cherokee was going to bring a lawsuit against either Whiting-Turner or their bonding company. (Fresolone Dep. 24:25-25:18). In response, recalling that Cherokee had provided Whiting-Turner sufficient time to get Cherokee paid in January and February, Mr. Fresolone testified that it was probably in February or March that he provided verbal notice of Cherokee's intent to bring a bond claim suit, and he admitted that was not sure if he did so during February or March. (Fresolone Dep. 24:25-25:18). Fresolone Aff. ¶ 21. In this connection, Mr. Fresolone was only questioned about the communications that he had regarding the filing of a lawsuit and he was not further questioned about the communications that he had with Whiting-Turner personnel during February 2005 before his February 16-26, 2005 vacation regarding Cherokee's efforts to secure payment from Whiting-Turner or the payment bond if payment was not forthcoming from Capital City Concrete for the work supplied by Cherokee regarding the Combo Fire Project. Fresolone Aff. ¶ 21.

The controlling legal issue is not notice of a potential lawsuit that need only be filed within a year of the last day worked. Instead, the controlling legal issue is whether on or before February 17, 2005 Cherokee brought home to Whiting-Turner that Cherokee was looking for payment from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete. The uncontroverted evidence on the record regarding the required Miller Act notice is that before February 17, 2005, as confirmed by Whiting Turner's letter dated February 20, 2005, Whiting Turner admitted that: "On Wednesday February 2, 2005 and two times thereafter, Louis Freselone [sic], Vice President of Cherokee Construction (subcontractor of Capital City Concrete), approached The Whiting-Turner Contracting Company regarding payment for work performed in November 2004." See Exhibit 2. Based upon such notice from Cherokee, Whiting-Turner withheld from contract proceeds otherwise then payable to Capital City Concrete to address the repeated payment demands made by Cherokee directly to Whiting-Turner. See Exhibit 1. In addition, it is entirely uncontroverted that in one or more of the payment discussion meetings between Mr. Fresolone and Mr. Natale before February 17, 2005, Mr. Fresolone showed to Mr. Natale Cherokee's unpaid invoice to Capital City Concrete for the Combo Fire Project. Fresolone Aff. ¶ 11.

The above-quoted February 20, 2005 Whiting-Turner letter, Mr. Fresolone's physical presentment of a copy of Cherokee's $33,284.20 unpaid Combo Fire Project invoice to Mr. Natale before February 17, 2007, and Whiting-Turner's contemporaneous record of withholding of funds sufficient to settle Cherokee's $33,284.20 payment demand that Cherokee presented directly to Whiting-Turner in a timely and effective manner constitutes uncontroverted controlling proof that Cherokee satisfied all applicable Miller Act notice requirements prior to the 90-day deadline on February 17, 2005. On this record, it is respectfully submitted that Defendant's pro forma

motion for partial summary judgment as to the Count III Miller Act bond claim should be denied.

III. ARGUMENT

A. Summary Judgment Standard of Review

This motion is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which in pertinent part provides: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] Tested against this controlling Rule 56(c) legal standard, Cherokee's uncontroverted evidence of providing timely and effective notice to Whiting-Turner prior to the February 17, 2005 90-day Miller Act notice deadline affirmatively

[4] When evaluating a summary judgment motion, the "critical inquiry is whether a genuine issue of material fact exists." Crawford v. Cooper/T.Smith Stevedoring Co., Inc., 14 F. Supp. 2d 202, 208 (D.R.I. 1998). The Court must view the record in the light most favorable to the nonmovant, and "give that party the benefit of all reasonable inferences in its favor." Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006). "At the summary judgment stage, there is 'no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood.'" Crawford, 14 F. Supp. 2d at 208 (quoting Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)). Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts are those 'that might affect the outcome of the suit under the governing law.'" Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). "A dispute as to a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.'" Id. On a motion for summary judgment, the court must view all evidence and related inferences in the light most favorable to the nonmoving party. Continental Casualty Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). At the summary judgment stage, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood." Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). Similarly, "summary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991).

establishes Cherokee's right to secure trial of its $33,284.20 Miller Act bond claim presented in Count III.

Alternately stated, Defendant's motion for partial summary judgment on Count III patently fails to discuss or even dispute Cherokee's uncontroverted evidence that demonstrates that Cherokee timely, fully and effectively satisfied all applicable Miller Act notice requirements prior to February 17, 2005. At bottom, summary judgment cannot be granted in favor of the Defendant on this record because the Defendant's summary judgment papers, and summary judgment argumentation, completely fail to grapple with the following uncontroverted record evidence that affirmatively establishes Cherokee's right to proceed to trial on its Count III Miller Act bond claim:

1. Whiting-Turner's letter dated February 20, 2005 that records Cherokee's efforts prior to February 17, 2005 to secure payment from Whiting-Turner,

2. Mr. Fresolone's physical presentment of a copy of Cherokee's unpaid $33,284.20 Combo Fire Project invoice to Mr. Natale before February 17, 2007 during one or more of the many payment demand meetings that Mr. Fresolone conducted with Whiting-Turner personnel before February 17, 2007,

3. Mr. Fresolone's request for bonding information from Whiting-Turner before February 17, 2007,

4. Whiting-Turner's contemporaneous record of withholding from Capital City Concrete of funds sufficient to settle Cherokee's $33,284.20 payment demand that Cherokee had timely and repeatedly presented directly to Whiting-Turner.

Defendant's exclusive reliance artful argumentation coupled with the Defendant's failure to address the controlling admissions included in Whiting-Turner's own Miller Act claims documentation force the conclusion that Cherokee timely and fully satisfied all Miller Act notice requirements and that Cherokee has affirmatively proved that Whiting-Turner had actual notice of Cherokee's Miller Act bond claim prior to February 17, 2005.

B. Cherokee's Proof of Actual Notice to Whiting-Turner Prior to February 17, 2005 Regarding Cherokee's Miller Act Bond Defeats Defendant's Pro Forma Motion for Partial Summary Judgment

Defendant bonding company, St Paul, inappropriately seeks summary judgment as to Count III, Cherokee's Miller Act bond claim. Defendant's pro forma summary judgment motion regarding Count III relies on the false premise that St Paul's bonded principal, Whiting Turner Contracting Company did not receive timely and adequate Miller Act bond claim notification.

The above-quoted February 20, 2005 Whiting-Turner letter, Mr. Fresolone's physical presentment of a copy of Cherokee's $33,284.20 unpaid Combo Fire Project invoice to Mr. Natale before February 17, 2007, and Whiting-Turner's contemporaneous record of withholding of funds sufficient to settle Cherokee's $33,284.20 payment demand that Cherokee presented directly to Whiting-Turner in a timely and effective manner constitutes uncontroverted controlling proof that Cherokee satisfied all applicable Miller Act notice requirements prior to the 90-day deadline on February 17, 2005. On this record, it is respectfully submitted that Defendant's pro forma motion for partial summary judgment as to the Count III Miller Act bond claim should be denied.

Regarding Count III, as a second tier subcontractor on the bonded Combo Fire Project, Cherokee's applicable Miller Act bond claim elements of proof are defined by 40 U.S.C. § 3133(b)(2):

> Person having direct contractual relationship with a subcontractor. A person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made. The action must state with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. The notice shall be served—(A) by any means that provides written, third-party

> verification of delivery to the contractor at any place the contractor maintains an office…

Accordingly Cherokee must prove that: 1) Cherokee furnished labor in the prosecution of the work required by a bonded Miller Act construction contract, 2) that Cherokee remains unpaid in the $33,284.20 amount claimed; and 3) that Cherokee satisfied "all conditions precedent" to timely commencing this action: a) timely commencement of this action per, 40 U.S.C. § 3133(b)(4), within one year of their last day of work on the bonded Project (which is not disputed); and b) proof that Cherokee provided legally satisfactory notice of its Count III claim to Whiting Turner within 90 days of the last day worked.

While Defendant prefers, and extensively recites, statements of the law from other jurisdictions, in this jurisdiction, this case and this motion are governed by U.S. ex rel. Water Works Supply Corp. v. George Hyman Construction Co., 131 F.3d 28, 32-33 (1st Cir. 1997), and the cases cited, discussed and relied upon therein. In George Hyman Construction Co, 131 F.3d at 32-33, the First Circuit delineated the flexibility that Courts must apply in determining whether a second tier-subcontractor like Cherokee on the Count III Combo Fire Project satisfied the Miller Act's 90-day notice of claim condition precedent:

> While adherence to the notice requirement is mandatory, courts have allowed some informality in complying with the terms of the Miller Act regarding the method by which notice must be served. See, e.g., Fleisher Eng'g & Constr. Co. v. U.S. ex rel. Hallenbeck, 311 U.S. 15, 18, 61 S. Ct. 81, 85 L. Ed. 12 (1940) (holding written notice sufficient although it was not sent via registered mail as statute provides); Coffee v. U.S. ex rel. Gordon, 157 F.2d 968, 969 (5th Cir. 1946) (holding that a writing exhibited to the general contractor in the course of a discussion served as adequate notice under the Act). Courts have also been somewhat forgiving of deviations from the statutory requirement that the notice be in writing. See, e.g., Altech, 929 F.2d at 1092 (holding that the "only reasonable inference" from a meeting was that the subcontractor sought payment from the general contractor).
>
> The language of the Miller Act requires notice to the general contractor of the amount of the claim and name of the party to whom the material was furnished; it does not expressly require a demand that the general contractor pay. 40 U.S.C. §

> 270b(a); see also McWaters & Bartlett v. United States ex rel. Wilson, 272 F.2d 291, 295 (10th Cir. 1959). Nevertheless, courts have consistently, and we think correctly, held that "the written notice and accompanying oral statements must inform the general contractor, expressly or impliedly, that the supplier is looking to the general contractor for payment so that it plainly appears that the nature and state of the indebtedness was brought home to the general contractor." United States ex rel. Kinlau Sheet Metal Works, Inc. v. Great Am. Ins. Co., 537 F.2d 222, 223 (5th Cir. 1976) (internal quotation marks omitted); see also United States ex rel. Bailey v Freethy, 469 [**12] F.2d 1348, 1350-51 (9th Cir. 1972).
>
> * * *
>
> But while adequate notice requires bringing home to the general contractor that the supplier is looking to it for payment, courts have not required formalistic proof of this. Communications sent to the general contractor detailing the supplier's claim against the subcontractor may, for example, [**13] be supplemented by oral and other written exchanges if these make it unambiguously clear that the supplier is seeking payment from the general contractor. See Altech, 929 F.2d at 1093; Coffee, 157 F.2d at 970; Kinlau, 537 F.2d at 223.
>
> The record here shows not only that Water Works sent Hyman the amount and details of Water Works's claims against the subcontractor, but that these were accompanied by further oral and written communications that could only be perceived, and were in fact perceived, as looking to Hyman itself for payment.

Just as in the George Hyman Construction Co. fact pattern, Whiting-Turner fully understood that Cherokee was looking to Whiting-Turner itself for payment. And because Whiting-Turner fully understood that Cherokee was looking to Whiting-Turner itself for payment, Whiting-Turner wrote the February 20, 2005 letter to Capital City Concrete and withheld payment from Capital City Concrete. On this record, Whiting-Turner's February 20, 2005 letter to Capital City Concrete proves Cherokee's satisfaction of the Miller Act 90-day claim notice requirement.

Cherokee must emphasize that, as a matter of law and as a matter of uncontroverted fact, Cherokee's clear and timely delivery of actual notice to Whiting-Turner effectively and completely achieved all purposes and policies for which Congress imposed upon the Miller Act cause of action a 90-day notice deadline for second tier subcontractors. In George

Hyman Construction Co, 131 F.3d at 32, the First Circuit identified the policy purpose mandating the 90-day notice deadline for second tier subcontractors:

> Fulfilling the Act's notice provision is a strict condition precedent to recovery by suppliers of first-tier subcontractors. See Ahern, 649 F.2d at 31. The notice provision serves an important purpose: it establishes a firm date after which the general contractor may pay its subcontractors without fear of further liability to the materialmen or suppliers of those subcontractors. See id.; Noland Co. v. Allied Contractors, Inc., 273 F.2d 917, 920-21 (4th Cir. 1959).

Here, it is undisputed that Cherokees' timely, clear and effective notice, allowed and actually caused Whiting-Turner to stop payment on the December 30, 2004 progress payment requisition that Whiting-Turner otherwise would have released to Capital City Concrete but for Cherokee's timely Miller Act notices. Cherokee plainly "brought it home" to Whiting-Turner that Whiting Turner had better withhold enough money from Capital City Concrete on the Combo Fire Project or face a Miller Act bond claim without having retained the disputed funds from Capital City Concrete. Just as the summary judgment motion attempts to ignore the controlling and fatal de facto Miller Act notice admissions contained in Whiting-Turner's letter to Capital City Concrete dated February 20, 2005, so too does the summary judgment motion fatally ignore Whiting-Turner's contemporaneous Miller Act self-help withholding of $39,000 from Combo Fire Project contract proceeds then otherwise due to Capital City Concrete.

Cases expressly relied upon by the First Circuit's decision in Hyman Construction Co, 131 F.3d at 32, include a line of Fifth Circuit cases that require analysis of the statutory sufficiency of the type of verbal communications and payment demand meetings that frequently occur in the context of Miller Act notice and payment disputes, just like the many payment demand meetings

that Cherokee conducted with Whiting-Turner personnel before February 17, 2005.[5] For example in United States ex rel. Consol. Elec. Distribs., Inc. v. Altech, Inc., 929 F.2d 1089, 1092 (5th Cir. 1991), the Fifth Circuit held that the "only reasonable inference" from a meeting was that the subcontractor sought payment from the general contractor. Just like Cherokee's presented its unpaid invoice on the Combo Fire Project in one or more of Mr. Fresolone's meetings with Mr. Natale before February 17, 2005, at a similar meeting discussed in the Altech case, the subcontractor presented to the general contractor invoices that the subcontractor claimed were unpaid on a Miller Act bonded project run by the general contractor.

The following paragraph from the Altech, Inc. opinion discusses a fact pattern that is materially indistinguishable from the facts controlling Cherokee's claim, and further confirms the statutory legal sufficiency of the timely Miller Act claim notice that Cherokee provided to Whiting-Turner by approaching Whiting-Turner in payment demand meetings, by verbally requesting payment bond information and by presenting Cherokee's unpaid invoice to Mr. Natale for review prior to February 17, 2005:

---

[5] In addition, the Altech, Inc., provided the following summary of the holding in Coffee v. United States ex rel. Gordon, 157 F.2d 968, 969 (5th Cir. 1946), another case cited by the First Circuit in Hyman Construction Co., 131 F.3d at 32:

> The Fifth Circuit has permitted some "liberality as to the manner of communicating the written notice." In Coffee v. United States ex rel. Gordon, we held that a "writing containing the information which the statute requires, exhibited to the contractor by the claimant as a notice of his claim and which the contractor examines and discusses . . . is a written notice sufficiently served."
>
> In the Coffee case, the supplier and the general contractor had a meeting within the ninety day period to discuss a subcontractor's outstanding balance. The supplier brought to the meeting a list of all the invoices that remained unpaid by the subcontractor. The general contractor and the supplier examined the list together and discussed it. The court determined that both parties "understood that a claim was contemplated on the payment bond" and thus, held that the list of invoices constituted sufficient written notice under the Miller Act.

> Similarly, in the case at bar, Consolidated met with Altech on June 21st to discuss Williams' outstanding balance. At the meeting, Consolidated presented Altech with unpaid invoices for materials which were supplied by Consolidated to Williams for use on the Red River Army Depot project. The parties discussed the invoices, and Altech retained the invoices for further review. Indeed, the only reasonable inference from the meeting is that Consolidated was seeking payment from Altech and that the presentation of the unpaid invoices at the meeting was intended to constitute written notice of Consolidated's claim for the amount owed by Williams.

In Houston Fire & Casualty Company v. United States ex rel. Trane Company, 217 F. 2d 727 (5th Cir. 1954), the Fifth Circuit held that, not unlike the February 20, 2005 letter that Whiting-Turner wrote to Capital City Concrete demanding an explanation concerning the payment demands that Cherokee was making directly to Whiting-Turner, the letter in Trane Company case from the general contractor to a supplier on a Miller Act bonded project that openly acknowledging a debt by the general contractor constituted sufficient a writing sufficient to constitute the required Miller Act notice even though the letter came from the general contractor and not the unpaid claimant. In Trane Company, 217 F. 2d at 730, the Fifth Circuit held that "it is not necessary that the writing relied on be signed by the supplier, it is sufficient that there exists a writing from which, in connection with oral testimony, it plainly appears that the nature and state of indebtedness was brought home to the general contractor."

It is true that Trane is distinguishable from the Cherokee fact pattern in that the Trane general contractor actually admitted financial responsibility to pay the Miller Act claimant. However, the test under the Miller Act notice cases in not acceptance of liability but rather the sufficiency of proof that the general contractor was provided timely and effective notice before expiration of the 90-day notice period. Here, while Cherokee's fact pattern does not include a forthright admission of contingent liability by Whiting-Turner, Cherokee has proven timely and effective notice was provided to Whiting-Turner as established by Whiting-Turner's contemporaneous Miller Act claim defense documentation sent to Capital City Concrete by letter dated February

20, 2005 and by Whiting-Turner's contemporaneous Miller Act self-help by defensively withholding $39,000 from Combo Fire Project contract proceeds then otherwise due to Capital City Concrete to protect itself from its contingent Miller Act liability to Cherokee. It is respectfully submitted that the February 20, 2005 letter that Whiting-Turner wrote to Capital City Concrete demonstrates that Cherokee had timely "brought home" to Whiting-Turner the nature, amount and state of indebtedness that Cherokee was presenting to Whiting-Turner to secure payment of Cherokee's unpaid Combo Fire Project invoice and that Whiting-Turner's letter proves the statutory legal sufficiency of the timely Miller Act claim notice that Cherokee provided to Whiting-Turner.

In George Hyman Construction Co, 131 F.3d at 32, the First Circuit also relied upon the analysis of the Miller Act's notice requirements as supplied by the United States Supreme Court in Fleisher Eng'g & Constr. Co. v. U.S. ex rel. Hallenbeck, 311 U.S. 15, 18, 61 S. Ct. 81, 85 L. Ed. 12 (1940) (holding written notice sufficient although it was not sent via registered mail as statute provides). It cannot be disputed that Cherokee's timely Miller Act claim notice to Whiting-Turner did not include any certified mail notice until April 2005. However, as made plain by the following analysis set forth by the Supreme Court in the Fleisher Eng'g & Constr. Co. decision, it is the timeliness and effectiveness of the disputed Miller Act notice, and not the form of the Miller Act notice that determines the statutory legal sufficiency of an otherwise timely and effective Miller Act claim notice:

> In giving the statute a reasonable construction in order to effect its remedial purpose, we think that a distinction should be drawn between the provision explicitly stating the condition precedent to the right to sue and the provision as to the manner of serving notice. The structure of the statute indicates the distinction.
>
> The proviso, which defines the condition precedent to suit, states that the material-man or laborer "shall have a right of action upon the said payment bond upon giving written notice to said contractor" within ninety days from the date of final performance. The condition as thus expressed was fully met.

> Then the statute goes on to provide for the mode of service of the notice. "Such notice shall be served by mailing the same by registered mail, postage prepaid," or "in any manner" in which the United States marshal "is authorized by law to serve summons."
>
> We think that the purpose of this provision as to manner of service was to assure receipt of the notice, not to make the described method mandatory so as to deny right of suit when the required written notice within the specified time had actually been given and received. In the face of such receipt, the reason for a particular mode of service fails. It is not reasonable to suppose that Congress intended to insist upon an idle form. Rather, we think that Congress intended to provide a method which would afford sufficient proof of service when receipt of the required written notice was not shown.

On this record, as a matter of law, Cherokee has conclusively proven that prior to February 17, 2005, Whiting-Turner had actual, timely, clear and effective notice of Cherokee's Miller Act claim regarding the $33,284.20 unpaid Combo Fire Project invoice as confirmed by the following uncontroverted evidence on the record in this case:

1. Whiting-Turner's letter dated February 20, 2005 that records Cherokee's efforts prior to February 17, 2005 to secure payment from Whiting-Turner,

2. Mr. Fresolone's physical presentment of a copy of Cherokee's unpaid $33,284.20 Combo Fire Project invoice to Mr. Natale before February 17, 2007 during one or more of the many payment demand meetings that Mr. Fresolone conducted with Whiting-Turner personnel before February 17, 2007,

3. Mr. Fresolone's request for bonding information from Whiting-Turner before February 17, 2007, and

4. Whiting-Turner's contemporaneous record of withholding from Capital City Concrete of funds sufficient to settle Cherokee's $33,284.20 payment demand that Cherokee had timely and repeatedly presented directly to Whiting-Turner.

CONCLUSION

Wherefore, Plaintiff respectfully requests that this Honorable Court deny Defendant St Paul's pro forma motion for partial summary judgment as to the Count III Miller Act bond claim and grant Plaintiff such other and further relief as just and proper.

Respectfully submitted,

PLAINTIFF CHEROKEE CONSTRUCTION, INC.

By its Attorneys,

CHARLES S. KIRWAN & ASSOCIATES

/s/ Charles S. Kirwan
Charles S. Kirwan (Bar #4050)
204 King Philip Street
Providence, RI 02909
(401) 359-1166
(401) 272-6875 (fax)

CERTIFICATION

I hereby certify that on this 20th day of June 2007, I caused a true and complete copy of the foregoing to be transmitted via telecopier and mailed first class postage prepaid to counsel of record in this action: Christopher C. Whitney, Esq., Michael D. Williams, Esquire, LITTLE, MEDEIROS, KINDER, BULMAN & WHITNEY, PC, 72 Pine Street, Providence, RI 02903.

/s/ Charles S. Kirwan