# Fresolone Affidavit

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA
FOR THE USE AND BENEFIT OF
CONCRETE PLACEMENT, INC. and
CHEROKEE CONSTRUCTION, INC.
Plaintiffs

v. C.A. No. 05-480S

ST. PAUL FIRE & MARINE INS. CO.
Defendant

**AFFIDAVIT OF LOUIS FRESOLONE**

I, Louis Fresolone, as Vice President of Cherokee Construction, Inc. ("Cherokee"), hereby depose and say:

1. I have personal knowledge of the facts recited herein.

2. Cherokee Construction, Inc. ("Cherokee") is a Rhode Island corporation engaged in the construction industry as a concrete contractor, providing various construction services related to concrete placement, structural concrete and decorative concrete.

3. I have been Vice President of Cherokee for approximately twenty-four years.

4. During 2004, and ending with our last day of work on November 19, 2004, Cherokee's laborers performed specified concrete flatwork services at the Newport Navy Base for the United States Navy's "Consolidated Fire, Police and Security Building North Gate and Gate No. 2" project known as the Combo Fire Station and Gates Project. For Cherokee, I was responsible for the negotiation and performance of Cherokee's agreed scope of work.

5. Cherokee worked on the Combo Fire Station and Gates Project as a subcontractor to Capital City Concrete. Capital City Concrete was a subcontractor to the Whiting-Turner Contracting Company, the Construction Manager for the Combo Fire Station and Gates Project.

6. On or about November 30, 2004, I prepared Cherokee's invoice to Capital City Concrete in the amount of $33,284.20 and sought payment from Capital City Concrete for the construction services that Cherokee supplied during November 2004 to complete Cherokee's specified work on the Combo Fire Station and Gates Project.

7. Because Capital City Concrete did not promptly pay that invoice I visited Whiting-Turner's on-site office, an office trailer, and, on a number of occasions in January and February 2005, I met in person with Whiting-Turner's on-site representative, Andrew Natale, who was Whiting-Turner's assistant project manager.

8. During January 2005, I put Whiting-Turner on notice that Cherokee had not been paid and that I was seeking information regarding the payment bond that I presumed existed for this Navy Base Contract.

9. I was away on an out-of-state vacation during the period from on or about the afternoon of Wednesday, February 16, 2005 through Saturday, February 26, 2005 and during that period I did not contact anyone from Whiting-Turner about payment of the unpaid invoice for the Combo Fire Station and Gates Project.

10. In a number of different conversations during February 2005 prior to my February 16-26, 2005 vacation, I made it clear to Mr. Natale that I wanted the payment bonding information for the project and that Cherokee intended to secure payment of the unpaid invoice for the Combo Fire Station and Gates Project from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete.

11. In at least one of my meetings with Mr. Natale during February 2005 before my February 16-26, 2005 vacation, during discussion of Cherokee's unpaid invoice, I showed him Cherokee's unpaid invoice to Capital City Concrete for the Combo Fire Station and Gates Project. I do not recall if he made a copy of it or not.

12. On at least one of my visits to the Whiting-Turner office trailer during February 2005 before my February 16-26, 2005 vacation, Mr. Natale introduced me to Matthew Belcher at which time we discussed my efforts to secure payment of Cherokee's unpaid invoice on the Combo Fire Station and Gates Project from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete. At that time, these Whiting-Turner representatives seemed to accept my statements Cherokee's unpaid invoice to Capital City Concrete for the Combo Fire Station and Gates Project and specifically informed me that it was Whiting-Turner's intention to withhold sufficient funds from progress payments then owed to Capital City Concrete to make sure that all of Capital City Concrete's subcontractors, including Cherokee, were properly paid. Attached hereto as Exhibit 1 are Whiting-Turner document nos. WTCC 0031-0032 produced in the course of discovery in this action which is a Whiting-Turner accounting form entitled "Accounts Payable – Special Instructions" dated March 3, 2005 that bears the hand written notation: "Capital City Concrete – December 2004 Invoice, Hold by W-T (Whiting-Turner) for Cherokee Payment Issue" together with the subject Capital City Concrete – December 2004 Invoice dated December 30, 2004.

13. During the discovery process in this litigation, I read Whiting-Turner's letter to Capital City Concrete dated February 20, 2005 (Whiting-Turner document no. WTCC 0036) that confirms and describes some of my efforts taken during February 2005 before my February 16-26, 2005 vacation in my attempt to try to cause Mr. Natale to secure payment for Cherokee's

unpaid invoice from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete. Whiting-Turner document no. WTCC 0036 is attached hereto as Exhibit 2.

14. The letter from Whiting-Turner to Capital City Concrete dated February 20, 2005 in part states: "On Wednesday February 2, 2005 and two times thereafter, Louis Freselone [sic], Vice President of Cherokee Construction (subcontractor of Capital City Concrete), approached The Whiting-Turner Contracting Company regarding payment for work performed in November 2004. Mr. Freselone [sic] claimed that no payment has been made for a $35,000.00 invoice submitted at the end of November 2004… Payments will not be made to Capital City Concrete until proper closure is made to this issue. It is Whiting-Turner's understanding that Cherokee Construction will no longer perform work under this contract. If this is the case please provide a final release of liens from this subcontractor in a timely fashion." See Whiting-Turner document no. WTCC 0036, attached hereto as Exhibit 2.

15. Because Cherokee's invoice for the Combo Fire Station and Gates Project in the amount of $33,284.20 remains unpaid, no representative of Cherokee ever signed a final release of liens, a release of liens, a partial waiver and release, or any other waiver or release of any description regarding the Combo Fire Station and Gates Project.

16. Whiting-Turner's letter dated February 20, 2005 plainly confirms that my communications with Whiting-Turner during February 2005 before my February 16-26, 2005 vacation successfully put Whiting-Turner on notice before February 17, 2005 that Cherokee intended to secure payment from Whiting-Turner or the payment bond if payment was not forthcoming from Capital City Concrete for the work supplied by Cherokee regarding the Combo

Fire Station and Gates Project. See Whiting-Turner document no. WTCC 0036, attached hereto as Exhibit 2.

17. Despite the verbal requests that I made to Whiting-Turner for payment bond information before my February 16-26, 2005 vacation, and despite the written request that I made for bond information on March 2, 2005, Whiting-Turner did not provide me the requested bond until on or about March 14, 2005. In this regard, note the following statement included in Whiting-Turner's letter to Capital City Concrete dated March 2, 2005 (see Whiting-Turner document no. WTCC 0040): "Whiting-Turner is legally bound by the Miller Act to provide this bond information to Cherokee Construction in a timely fashion upon written request." Whiting-Turner document no. WTCC 0040 is attached here to as Exhibit 3.

18. The Defendant's partial summary judgment papers try to take my deposition testimony out of context regarding the efforts that I took during February 2005 before my February 16-26, 2005 vacation to put Whiting-Turner on notice that Cherokee intended to secure payment from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete. In my deposition testimony I confirmed that in January 2005, I put Whiting-Turner on notice that Cherokee had not been paid and that I was seeking information regarding the payment bond that I presumed existed for this Navy Base Contract. See Excerpts from Deposition of Louis Fresolone at 12:3 – 14:12 (page: line), Exhibit 4 attached hereto (hereinafter Fresolone Dep.). Then I was asked:

> Q After that [my communications with Whiting-Turner in January 2005 about getting paid and securing information about the bond]. It's my assumption that you testified that that was the first time that you provided notice that you had a claim under the Miller Act. I want to know if there were subsequent conversations that you addressed that topic?
>
> A. Yes. 15

Q. And when did those other conversations occur?

A. I believe it was in February.

Q. Of 2005?

A. Correct.

See Exhibit 4, Fresolone Dep. 14:20-15:4.

19. Then regarding my communications with Whiting-Turner in February 2005, I testified that there were far too many conversations to recall everything that was said during February 2005 between myself and Whiting-Turner personnel:

Q. Do you know how many different conversations you had in February of '05 with Whiting-Turner personnel?

A. That's tough, that's a tough question because I was involved with the Gates project as a second tier sub, and at this time in February we were negotiating a contractual deal directly, doing work for Whiting-Turner for the child day care center. So, for me to give you a specific amount of days, Mike, I really couldn't because there were days I was speaking on different issues.

See Exhibit 4, Fresolone Dep. 15:21-16:6.

20. Review of my deposition transcript (see Exhibit 4, Fresolone Dep. 16:14-18:11) confirms that after the above-quoted question, rather than exhaust the topic of all of the communications that I had with Whiting-Turner during February 2005, I was asked a total of only two questions about conversations that I recalled with respect to my February 2005 communications with Whiting-Turner personnel with respect to Cherokee's efforts to secure payment for Cherokee's unpaid invoice from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete. During my deposition that lasted a total of forty-six (46) minutes (see deposition cover page and final page, Exhibit 4, Fresolone Dep. 35:25), I testified regarding two specific conversations that occurred during February 2005, but I was not asked if I recalled any other specific conversations that occurred during February 2005

with respect to Cherokee's efforts to secure payment for Cherokee's unpaid invoice from Whiting-Turner or the payment bond. See Exhibit 4, Fresolone Dep. 16:14-18:11. At no time during my deposition was I asked to point out any additional information that I deemed important; no was I asked any similar "catch-all question." My deposition did not include questions about any of the following events that occurred during February 2005 before my February 16-26, 2005 vacation:

a. I was not asked if I provided Whiting-Turner personnel a copy of the unpaid invoice before my February 16-26, 2005 vacation.

b. I was not asked if I requested bond information again in February 2005 before my February 16-26, 2005 vacation after my initial requests in January 2005.

c. I was not asked what I had communicated to Whiting-Turner personnel before my February 16-26, 2005 vacation during February 2005 about my intention to secure payment from Whiting-Turner or the payment bond if payment was not forthcoming from Capital City Concrete.

d. And even though the letter from Whiting-Turner to Capital City Concrete dated February 20, 2005 states: "On Wednesday February 2, 2005 and two times thereafter, Louis Freselone [sic], Vice President of Cherokee Construction (subcontractor of Capital City Concrete), approached The Whiting-Turner Contracting Company regarding payment for work performed in November 2004", I was not asked any specific questions about what happened on February 2, 2005 nor was I asked any questions about the two (or more) other occasions during February 2005 before I left for vacation on February 16, 2005 in which I communicated with Whiting-Turner personnel regarding payment for work Cherokee performed on the Combo Fire Station and Gates Project in November 2004. See Whiting-Turner document no. WTCC 0036, attached hereto as Exhibit 2.

21. Later in my deposition, I was shown my attorney's letter to Whiting-Turner dated March 25, 2005. Exhibit 4, Fresolone Dep. 22:8-25:18. Referencing that exhibit, I was then asked if before the date of that letter, March 25, 2005, what communications I had with Whiting-Turner personnel in March 2005 (Fresolone Dep. 24:11-20), and did I verbally inform Whiting-Turner that I was going to bring a lawsuit against either Whiting-Turner or their bonding company. (Fresolone Dep. 24:25-25:18). In response, recalling that I had provided Whiting-Turner sufficient time to get Cherokee paid in January and February, I testified that it was probably in February or March that I provided verbal notice of Cherokee's intent to bring a bond claim suit, but I was not sure if that occurred in February or March. (Fresolone Dep. 24:25-25:18). In this connection, I was only questioned about the communications I had regarding the filing of a lawsuit and I was not further questioned about the communications that I had with Whiting-Turner personnel during February 2005 before my February 16-26, 2005 vacation regarding Cherokee's efforts to secure payment from Whiting-Turner or the payment bond if payment was not forthcoming from Capital City Concrete for the work supplied by Cherokee regarding the Combo Fire Station and Gates Project.

22. To assure that Cherokee obtained the bond information from Whiting-Turner first requested in January 2005, I faxed to Mr. Natale the letter dated March 2, 2005 attached hereto as Exhibit 5. Thereafter, to further confirm notice to Whiting-Turner, Cherokee retained an attorney who caused two notices to be sent to Whiting-Turner dated March 25, 2005 and April 13, 2005. Whiting-Turner's copy of the letter dated March 25, 2005 confirms that Whiting-Turner received that letter by fax on March 25, 2005. See Defendant's Exhibit D Whiting-Turner document no. WTCC 0041-0043. Whiting-Turner's copy of the letter dated April 13,

2005 that was delivered to Whiting-Turner via certified mail return receipt requested appears at Defendant's Exhibit D, Whiting-Turner document nos. WTCC 0067-0070.

FURTHER AFFIANT SAYETH NOT

VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of American that the forgoing is true and correct. Executed this 18th day of June, 2007.

______________________