# PLAINTIFF'S EXHIBIT 4

UNITED STATES OF AMERICA
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA for the use and benefit of CONCRETE PLACEMENT, INC. and CHEROKEE CONSTRUCTION, INC.

VS. C.A. NO. 05-480S

ST. PAUL FIRE & MARINE INSURANCE CO.

DEPOSITION OF LOUIS FRESOLONE, CHEROKEE CONSTRUCTION, a Plaintiff in the above entitled cause, taken on behalf of the Defendant, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Little Medeiros Kinder Bulman & Whitney, PC, 72 Pine Street, Providence, Rhode Island, on January 11, 2007, at 2:50 P.M.

APPEARANCES:

FOR THE PLAINTIFFS......CHARLES S. KIRWAN & ASSOCIATES
BY: CHARLES S. KIRWAN, ESQUIRE

FOR THE DEFENDANT.......LITTLE MEDEIROS KINDER BULMAN & WHITNEY, PC
BY: MICHAEL D. WILLIAMS, ESQ.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

I'm not sure of the gentleman's name.

Q. Now, I asked you about the Miller Act and the Miller Act notice requirements before. In regards to the Combo Fire project, are you aware of the first day that you gave notice to Whiting-Turner that you were going to assert a claim under the Miller Act?

A. I believe it was in January, beginning of January; the date right now is unclear.

Q. This is 2005 or 2006?

A. That would be in 2005, I believe, because the work was performed in '04.

Q. Was this notice verbal or written?

A. Verbal.

Q. Do you remember who you talked to on that day?

A. I believe I spoke to Mr. Andrew Natale.

Q. Do you remember the substance of that conversation?

A. I just asked Andrew if I could have bond information for lack of payment on that project.

Q. When you say lack of payment, what do you mean?

A. Well, the work was performed in November of '04, I believe. January '05, I mean, that's a substantial amount of time to be paid.

Q. Who is responsible for paying you on Combo Fire,

which entity was responsible for paying Cherokee on Combo Fire?
A. Cherokee was a second tier sub for Capital City Concrete.
Q. So it was -- Cherokee was a second tier sub that contracted directly with Capital City Concrete, correct, or were they a second tier sub for Capital City Concrete?
A. Clarify. Cherokee was working for Capital City Concrete.
Q. Directly?
A. Directly.
Q. So, contractually, it was Capital City Concrete who was supposed to be paying Cherokee on the Combo Fire project?
A. Right.
MR. KIRWAN: Objection. You can answer.
MR. KIRWAN: He said yes.
A. Yes.
Q. During that conversation with Mr. Natale in January of '05, you said you asked him for his bond information?
A. I believe I brought it to his attention that we weren't paid on the project, and he spoke to me

about he would look into that.

Q. So in that conversation you informed Mr. Natale that you were not paid on the project and you asked him for the bond information, is that an accurate description of what that conversation contained, in your opinion?

A. I believe so. Yes.

Q. During that conversation in January of '05, did you tell Mr. Natale that Cherokee may be asserting a direct claim against Whiting-Turner or Whiting-Turner's bonding company?

A. No, not at that time.

Q. Moving on from that initial conversation in January 2005. Did you have any other subsequent conversations with either Mr. Natale or anybody else from Whiting-Turner about the fact that you weren't being paid on the project?

THE WITNESS: Would that be prior or after?

Q. After that. It's my assumption that you testified that that was the first time that you provided notice that you had a claim under the Miller Act. I want to know if there were subsequent conversations that you addressed that topic?

A. Yes.

Q. And when did those other conversations occur?
A. I believe it was in February.
Q. Of 2005?
A. Correct.
Q. And who were those conversations with?
A. Andrew Natale, Beth Leslie, and I believe the gentleman's name is Matt Belka (phonetic) for Whiting.
Q. I assume this is more than one conversation that you're referring to in February of 2005?
A. Yes.
Q. If you can, and I don't know if you remember or not, but could you summarize basically, first of all, can you state how many conversations did you have in February of 2005 regarding your intent to bring a claim under the Miller Act?
MR. KIRWAN: Regarding the Combo Gates project?
MR. WILLIAMS: Yes. Every question I ask is on Combo Fire.
Q. Do you know how many different conversations you had in February of '05 with Whiting-Turner personnel?
A. That's tough, that's a tough question because I was involved with the Gates project as a second

tier sub, and at this time in February we were negotiating a contractual deal directly, doing work for Whiting-Turner for the child day care center. So, for me to give you a specific amount of days, Mike, I really couldn't because there were days I was speaking on different issues.

Q. You were dealing directly with Whiting-Turner on the CDC project and then you were also talking to them about Combo Fire as well?

A. That's absolutely correct.

Q. And it's difficult to remember, to set aside which discussion was for what purpose?

A. Yes.

Q. Can you generally summarize what occurred in those discussions in February of 2005 regarding the Combo Fire project that you had with Whiting-Turner?

A. I remember one specific with Andrew Natale asking me, due to the lack of payment at the Gates project, if it would hinder the scheduled work to be done at the child day care center, and I assured him it wouldn't.

Q. Do you remember anything else from those conversations with Whiting-Turner personnel in February 2005 regarding the Combo Fire project?

A. I believe in February it was brought to their attention that a waiver of lien -- well, let me back up one second, please. As I stated, it was -- the Gates project, for lack of payment, I'm negotiating a contract to do work directly for Whiting-Turner on the CDC building. So, in the interim of negotiating for the CDC and talking about scheduling and any such matters, it was brought to my attention that a waiver of lien was signed by myself that said that I was paid for the work that was completed on the Gates project from Capital City Concrete.

Q. I don't want to get too much into that, I know I have you here for a limited purpose, but I understand that waiver of lien that you just described is the heart of another lawsuit that's currently active, correct?

A. Yes.

Q. And that's in Providence Superior Court, correct?

A. I believe so, yes.

Q. I don't want to get too far into that.

A. We're running in conjunction here. The trains are coming down the track side-by-side.

Q. I understand that. I'll call you in again and we can get into that in bloody detail.

A. It seems you're trying to make it gray --

MR. KIRWAN: Don't debate. Let him ask the question. Your job is to answer his questions as accurately as you can.

Q. Now do you remember the last day that Cherokee performed work on the Combo Fire project?

A. I believe it was November 18th of 2004.

Q. Do you have any document that can confirm that that was the last day that Cherokee performed work on that Combo Fire project?

A. Yes.

MR. WILLIAMS: I asked for your production of that document through your counsel.

THE WITNESS: Yes.

MR. WILLIAMS: Thank you.

MR. KIRWAN: We also ask that you produce the certified payrolls you have from Cherokee's work in November '04. I should have pressed that sooner.

MR. WILLIAMS: I will do that.

(DEFENDANT'S EXHIBIT A MARKED FOR IDENTIFICATION)

Q. I'm going to put in front of you what has been marked as Defendant's Exhibit A, there's multiple pages in Exhibit A and they are actually a few

Q. Why in some situations would you have it notarized and other situations you wouldn't?
A. It all depends what the circumstance calls for.
Q. Why do you feel the circumstance behind writing this letter called for a notarized signature?
A. $35,000 of completed work.
Q. Understood. I'd like to move on to the second and third page of Exhibit A, it's a March 25th letter from --
MR. KIRWAN: Can we go off the record for a second?
MR. WILLIAMS: Absolutely.
(OFF THE RECORD)
MR. WILLIAMS: We'll go back on the record. We just removed when we were off the record a few pages from Exhibit A because it contains duplicative pages of other pages that are later on in Exhibit A.
Q. So, Mr. Fresolone, I'd like you to turn to the pages marked in the bottom right-hand corner as CHEROKEE-96 and also 97, 98, 99 and 100. Those are all part of the same -- those are related to the same document. The one marked with 96 in the bottom right-hand corner is a letter dated March

25th, 2005 from Charles S. Kirwan to Andrew Natale; Number 98 is a document entitled Partial Waiver and Release For Second Tier Subcontractors and Suppliers, which I do believe was attached to the March 25th, 2005 letter, and document bearing the number 99 in the bottom right-hand corner is a certified mail receipt; and the document bears the number 100 in the bottom right-hand corner is the return receipt which appears to be signed by somebody at Whiting-Turner on a date of, I believe that says March -- I'm not really sure what date that says, unfortunately. I think it says April 20th; it's difficult to read.

MR. KIRWAN: I think we can probably stipulate, I believe that it's 4-20.

Q. Mr. Kirwan received it originally, so we can stipulate to April 20th. Mr. Fresolone, have you seen this letter before?

A. Yes.

Q. Outside of any discussions with counsel regarding the case that we're here for, when have you seen this?

A. This was brought to my attention. I wrote some of this with my counsel at that time.

Q. At that time, meaning around the date of March 25,

2005? I assume it would be before that date.
A. It would be before that, just prior to.
Q. The week leading up to it, perhaps?
A. Perhaps.
Q. Now, without getting into anything that you may have discussed with your counsel, did you -- do you understand what the reason was behind sending this letter?
A. The reason for this was acting on the Miller Act bond for lack of payment on that project.
Q. Before you sent this letter, and not including any of the conversations that we've addressed that occurred in January and February of 2005, did you have any conversations with Whiting-Turner in March of 2005 before you sent this letter -- I'm sorry, before your counsel sent this letter?
A. I believe so.
Q. Do you remember the substance of those conversations?
A. No, I don't.
Q. Do you remember how many you may have had regarding the Combo Fire project?
A. No, I don't. Because it was running in conjunction with the child day care project.
Q. Before the date of this letter, March 25, 2005,

did you verbally inform Whiting-Turner that you were going to bring a lawsuit against either them or their bonding company?

A. I believe so, yes.

Q. Do you remember when you did that?

A. It was probably around that time of February or March.

Q. But you're not sure whether it occurred in February or March?

A. No, I'm not because, like I said, we were working in conjunction strictly for Whiting-Turner on child day care and this had to do with work performed as a second tier sub on the Gates project.

Q. Do you have any kind of records or internal memorandum that keep track of the conversations that you had with Whiting-Turner on Combo Fire?

A. No.

Q. The lien, the partial waiver and release that has the number 98 in the bottom right-hand corner Bates stamped, do you under -- is it your understanding that partial waiver and release was included with the March 25, 2005 letter?

A. Yes.

Q. And is this the document that you were referring

partial waiver and release document at CHEROKE-98 in Exhibit A, other than the letters we addressed as part of Exhibit A and other than the oral communications that you've already addressed in this deposition that occurred in January, February and March of 2005, were there any other notices to Whiting-Turner or its bonding company that you were going to bring a claim under the Miller Act regarding the Combo Fire project?

A. I don't believe so.

Q. Eventually, the reason why this lawsuit is active today is because you were not paid the money that you were demanding; is that correct?

A. That's correct.

MR. WILLIAMS: I have no other questions in regard to the Miller Act notice. I reserve the right to bring Mr. Fresolone back on other topics.

MR. KIRWAN: I need a quick break.

(RECESS)

THE REPORTER: Do you need a copy of this?

MR. KIRWAN: Yes, I probably need it.

(DEPOSITION CLOSED AT 3:36 P.M.)