UNITED STATES OF AMERICA
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA for the use and benefit of CHEROKEE CONSTRUCTION, INC. Plaintiff | : | |
| v. | : | C.A. No. 05-480S |
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant | : | |

**REPLY BRIEF OF DEFENDANT ST. PAUL FIRE & MARINE INSURANCE COMPANY, IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN RESPONSE TO THE OPPOSITION FILED BY PLAINTIFF**

Defendant St. Paul Fire & Marine Insurance Company ("St. Paul") respectfully submits this Reply Brief in support of its Fed. R. Civ. P. 56(b) Motion for Partial Summary Judgment, and in response to the Opposition recently filed by Plaintiff Cherokee Construction, Inc. ("Cherokee"). This Reply Brief is supplemental to the Memorandum previously filed by St. Paul in support of its Motion for Partial Summary Judgment, and St. Paul reiterates the entirety of its previously filed Memorandum without further restatement. Notwithstanding St. Paul's responses below to various arguments made by Cherokee in its Opposition papers, St. Paul urges this Honorable Court to grant its Motion on the grounds presented in its initial Memorandum, on the basis that Cherokee failed to satisfy the written notice requirement of 40 U.S.C. § 3133(b)(2) for the filing of a civil claim against St. Paul under 40 U.S.C. §§ 3131-3134 (the "Miller Act").

**Cherokee's claims for payment on the Combo Fire Project have been made in bad faith**

Cherokee is estopped from making any argument based on the totality of the available facts in an attempt to achieve proper Miller Act notice, because Cherokee had already cashed a check for $28,000 prior to most of those statements or writings. See Copy of front and back of

deposited check from Cap City made payable to Cherokee in the amount of $28,000, dated January 24, 2005 (the "Cleared Check"), **Exhibit A**, and a partial lien waiver and release dated November 27, 2004 (the "Lien Waiver"), **Exhibit B**, both attached hereto. The admissions listed below have only recently come to the attention of counsel for St. Paul.

Presently, Capital City Concrete, Inc. ("Cap City"), a subcontractor to St. Paul's bonded contractor The Whiting-Turner Contracting Company ("Whiting-Turner") on the subject project, the United States Navy's "Consolidated Fire, Police, and Security Building, North Gate and Gate No. 2" project, located in Newport, Rhode Island (the "Combo Fire Project") and Cherokee, among other parties, are litigants in a civil action in Rhode Island Superior Court, Providence County, enumerated Capital City Concrete, Inc., et al v. Cherokee Construction, Inc., et al, P.C. No. 05-1911 (the "Providence Action"), also concerning the Combo Fire Project. See **Exhibit C**, Certified Copy of Verified Complaint, and **Exhibit D**, Certified Copy of Answer of Cherokee and Louis Fresolone, both attached hereto. In their filed Answer in the Providence Action, Cherokee and Mr. Fresolone admit in response to paragraph 14 of the Verified Complaint that Mr. Fresolone "went to the offices of Capital City Concrete and picked up a check numbered 426 in the amount of $28,000 that bears the notation 'Slab – FPS Bldg. (partial)[1]' attached to the Complaint as Exhibit B" (emphasis added). For the Court's benefit, all Exhibits to the Verified Complaint have been included, so that the Court can consider the copy of the check that Cherokee and Mr. Fresolone authenticate in their Answer. Further, Cherokee and Mr. Fresolone admit in full to the allegations contained in paragraph 15 of the Verified Complaint, which stated that "[a]ccording to the information on the back of Check No. 426 processed by Centreville Saving Bank, Cherokee deposited Check No. 426 into an account at Centreville Savings Bank on

January 25, 2005." In paragraph 23 from Cherokee's Counterclaim in the Providence Action, Cherokee and Mr. Fresolone allege that Cap City made "a partial payment only in the amount of $28,000" on January 24, 2005. In paragraph 26 of the Counterclaim, the defendants link the January 24, 2005 partial payment with Cherokee's work on the Combo Fire Project (referred to as the "Whiting-Turner Navy project" in the averment).

In summary, Cherokee and Mr. Fresolone admit to the following key facts in their Answer to the Verified Complaint filed in the Providence Action: (1) Lou Fresolone traveled to Cap City's office and picked up a check in the amount of $28,000 bearing the notation "Slab – FPS Bldg. (partial)," (2) Cherokee deposited that check into its account at Centreville Savings Bank on January 25, 2005, and (3) Exhibit B to the Verified Complaint is an accurate copy of the check from Cap City. These admissions place Cherokee's claims for payment occurring in February of 2005 or later in bad faith. Cherokee cannot rely on claims made in bad faith to satisfy the Miller Act notice requirement.

**Even if Cherokee's claims were not made in bad faith, the February 20, 2005 letter does not serve as a writing sufficient to constitute notice under the Miller Act**

Even if the above admissions never occurred, Cherokee is still unable to satisfy the Miller Act notice requirement under the most liberal of interpretations. Cherokee has failed to demonstrate the satisfaction of any of the four mandatory requirements for establishing notice under the Miller Act, as laid out in St. Paul's initial Memorandum, and the February 20, 2005 letter that it seeks to rely upon does nothing to strengthen its position.

Although Mr. Fresolone's late protestations and accusations of fraud may have put all parties on notice that Cherokee may have had a unique civil claim against Cap City, Whiting-

[1] Throughout the Providence Action, the parties refer to the Combo Fire Project as the "FPS Project" or "FPS Building". For example, see Cherokee's admission of paragraph 11 of the Verified Complaint from that action.

Turner could not be expected to reasonably believe that Cherokee intended to file a civil action under the Miller Act against Whiting-Turner or St. Paul when: (1) Whiting-Turner had already paid Cap City the monies owned to Cherokee for its work on the Combo Fire Project, (2) Cap City had presented the Lien Waiver to Whiting-Turner, and (3) Cap City had presented the cancelled check to Whiting-Turner. Cherokee does not dispute any of these facts, and has adopted them in the Providence Action. Further, Cherokee failed to serve any written notice upon Whiting-Turner or St. Paul within the Miller Act's ninety-day notice period. "The [Miller Act] makes the requirement of written notice from the supplier a condition precedent to a right of action on the bond; and no rule of liberality in construction can justify reading out of the statute the very condition which Congress laid down as prerequisite to the cause of action" Bowden v. Malloy, 239 F.2d 572, 577 (9th Cir. 1956).

Without having taken any discovery from St. Paul or Whiting-Turner on this topic, Cherokee argues that the February 20, 2005 letter "confirmed" that Whiting-Turner received notice of Cherokee's potential demand against it within the ninety-day notice period, which ended on February 17, 2005. However, when the letter is considered alongside with its attachments, the Lien Waiver and the Cleared Check, Cherokee's forced interpretation of the February 20, 2005 letter fails. Further, the letter is dated a few days after the expiration of the ninety-day Miller Act notice period. There is no case on record where Miller Act notice was found to be satisfied when no writing sufficient to establish notice occurred within the statutory ninety-day notice period. "In all of these cases, however, there was some written notice or acknowledgement within the ninety-day statutory period." Chicago Rigging Co. v. Uniroyal Chemical Co., 718 F.Supp. 696, 702 (N.D. Ill. 1989), citing Kelly-Mohrhusen Co., Inc. v. Merle A. Patnode Co., Ltd., 457 F.2d 116, 119 (7th Cir. 1972), and referring to Hillsdale Rock Co. v.

Cortelyou & Cole, Inc., 581 F.2d 239 (9th Cir. 1978), Houston Fire & Casualty Co. v. Trane Co., 217 F.2d 727 (5th Cir. 1954), and Greenwald Indus. Products Co. v. Barlows Commercial Constr. Co., 567 F. Supp. 464 (D.D.C. 1983).

On its face, the February 20 letter fails to confirm anything but the existence of a confusing situation on the Combo Fire Project as of the date of its authorship. In the February 20 letter, Whiting-Turner's Matthew Belcher states that "Whiting-Turner is concerned with the discrepancy between Capital City Concrete and its subcontractor Cherokee Construction," and then explains that Whiting-Turner will withhold payment until "proper closure is made to this issue." Whiting-Turner's decision to withhold further payment upon the indication of an unorthodox dispute between Cap City and Cherokee implicating accusations of fraud and forgery was reasonable, professional, and neutral. Certainly, the very nature of the dispute, with Cherokee alleging that Cap City forged Mr. Fresolone's signature on the Lien Waiver, did not directly involve Whiting-Turner and likely would not qualify as a legitimate payment bond claim. See **Exhibit E**, Payment Bond for Combo Fire Project, attached hereto. As of the writing of this letter, it would not be reasonable for Whiting-Turner to believe that Cherokee was looking to it for payment in its dispute with Cap City.

The March 2, 2005 letter from Whiting-Turner serves Cherokee no better. Although it states that Mr. Fresolone requested Whiting-Turner's bond information on February 28, 2005, the date of Mr. Fresolone's bond request and the letter itself fall well outside of the ninety-day Miller Act notice period, which is strictly construed. See, e.g., Cooley v. Barten & Wood, 249 F.2d 912, 914 (1st Cir. 1957) ("It is essential for the purpose of the notice that it be given within a certain period. Therefore the giving of the notice within the ninety day period is a condition precedent of the plaintiff's right of action under the Miller Act."). Therefore, with both the

February 20 and March 2 letter falling far short of writings that provided timely notice of Cherokee's intent to assert a claim against Whiting-Turner, with substantial accuracy, Cherokee has utterly failed to demonstrate the existence of a writing that satisfies the Miller Act written notice requirement. "Where a statute requires that written notice be given, and the written notice is entirely deficient, a finding that the statutory requirements were satisfied would effectively write the 'name' requirement out of the statute. This we cannot do." CTI / DC, Inc. v. Selective Insur. Co. of America, 392 F.3d 114, 121 (4th Cir. 2004). "In no case has writing been held unnecessary." Coffee v. Gordon, 157 F.2d 968, 969 (5th Cir. 1946).

The copy of the Cleared Check speaks for itself, and has since been confirmed by Cherokee and Mr. Fresolone as authentic in their filed Answer in the Providence Action. See **Exhibit A** and **Exhibit D** at ¶ 14. A reasonable examination of the Lien Waiver reveals it to be, indeed, a waiver of all claims by Cherokee arising out of the paid-for work on the Combo Fire Project, executed by Mr. Fresolone[2]. See **Exhibit B**. The Lien Waiver, when coupled with the Cleared Check, demonstrates to any reasonable observer that Cherokee was indeed paid the amount of $28,000 by Cap City, and had received those funds into its bank account. These are two independent and objective writings that formed reasonable grounds for Whiting-Turner's belief that Cherokee received the monies that it had previously paid to Cap City for Cherokee's work. The fact that Whiting-Turner withheld further payment to Cap City only indicates that Whiting-Turner remained neutral and handled the unique Cap City / Cherokee dispute in a rational and balanced manner. The only "evidence" countering the easy inference drawn from the Cleared Check and Lien Waiver are the unsupported allegations of Cherokee and Mr.

[2] St. Paul has learned that handwriting experts will be analyzing the Lien Waiver to determine whether it indeed contains Mr. Fresolone's signature. St. Paul's counsel is presently in possession of the original document, and is holding it in escrow for the parties in the Providence Action.

Fresolone. The veracity of those unsupported allegations are weakened by the fact that they are inferential, as Mr. Fresolone testified at deposition and confirmed in his affidavit that he could not recall whether he gave Whiting-Turner notice that Cherokee would assert a direct claim against Whiting-Turner or its bond in February or March of 2005.

**The Affidavit of Louis Fresolone should be disregarded in this Honorable Court's determination of Defendant's Motion for Partial Summary Judgment**

The Affidavit of Louis Fresolone, filed contemporaneously with Cherokee's Objection to St. Paul's Motion for Partial Summary Judgment, should be disregarded by this Honorable Court because it is inconsistent with Mr. Fresolone's prior testimony at deposition and his admissions in the Providence Action, and creates a "moving target" for the purposes of avoiding the grant of partial summary judgment. "If prior statements under oath could be disavowed at will after a motion is made, the other side would be faced with a constantly moving target and summary dispositions made almost impossible." Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000). The entire transcript from Mr. Fresolone's deposition has been attached to this Reply Brief as **Exhibit F** for the Court's review and convenience.

The First Circuit Court of Appeals has held that "[w]hen an interested witness has given clear answers to unambiguous questions [at deposition], he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994); see also Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105 (1st Cir. 2006) and Hernandez-Loring. As held in past First Circuit opinions, when an interested witness offers general allegations at deposition without offering many specific facts, and later signs an affidavit that furnishes several new details that appear on their face to

create an issue of fact, but were not offered at deposition, the affidavit will be disregarded. See Colantuoni, Orta-Castro, and Hernandez-Loring.

Mr. Fresolone's Affidavit is even more dubious when it is considered that Cherokee was fully aware that St. Paul was going to file a Motion for Partial Summary Judgment for several months prior to its actual filing[3], yet Cherokee waited until the 11th hour to file Mr. Fresolone's Affidavit and elected to not conduct any discovery. The First Circuit has found that the timing of contradictory affidavits, when executed after the filing of a motion for summary judgment and submitted for the sole purpose of opposing that motion, is "significant." See Colantuoni, 44 F. 3d at 5. In Orta-Castro, the First Circuit criticized the timing of an affidavit that was "executed only after Merck had filed its motion for summary judgment, thus suggesting that the Statement was made solely to create an issue of fact for the purpose of surviving summary judgment." 447 F.3d at 110. This "chronology" was found to be "probative of the fact that the non-movant was merely attempting to create an issue of fact," and factored into the Orta-Castro court's decision to disregard the affidavit. Id. at 110. As demonstrated below, the Affidavit of Lou Fresolone, who is a principal of Cherokee and an "interested witness," contradicts Mr. Fresolone's prior deposition testimony. Further, Cherokee fails to state a reason for the contradictions.

The Hernandez-Loring court also placed weight on the fact that the plaintiff's counsel had the opportunity to question other key witnesses about the specific facts that were contained in her affidavit, in order to corroborate them, but ultimately failed to do so. Id. at 53. Here, Cherokee did not undertake any discovery activities whatsoever, even when the Court allotted

[3] The court held a conference on August 15, 2006, in which the eventual filing of St. Paul's Motion for Partial Summary Judgment was discussed and this Court instructed the parties to take limited discovery on the topic of whether plaintiffs (Concrete Placement, Inc. was also a plaintiff at that time) had satisfied the Miller Act notice requirement, regarding Counts I and III of the Complaint.

Cherokee and St. Paul the specific opportunity to do so prior to St. Paul's contemplated summary judgment motion.

Upon direction from this Honorable Court and the agreement of counsel, Mr. Fresolone was presented as Cherokee's Rule 30(b)(6) designee on January 11, 2007 for the limited and exclusive purpose of examining whether Cherokee satisfied the Miller Act 90-day written notice requirement.

The most glaring example of conflict between Mr. Fresolone's Affidavit and his deposition testimony can be found at paragraph 20 of the affidavit. In that paragraph, which at times is difficult to comprehend, Mr. Fresolone states, under oath, that "I testified regarding two specific conversations that occurred during February 2005, but I was not asked if I recalled any other specific conversations that occurred during February 2005 with respect to Cherokee's efforts to secure payment," and "[a]t no time during my deposition was I asked to point out any additional information that I deemed important; no [sic] was I asked any similar 'catch-all question.' " Mr. Fresolone then continues in paragraph 20 of his Affidavit to allege that he was not asked about certain specific events that allegedly occurred during February of 2005.

However, at deposition, Mr. Fresolone testified as follows:

> Q: Mr. Fresolone, other than what's been put in front of you today [attached to the deposition transcript, **Exhibit F**, as its own Exhibit A], and other than what you've told me in terms of your verbal communications with Whiting-Turner in January, February and March 2005, any or all of which may be Whiting-Turner claims or may not be, are there any other events, either written or oral, that you would assert as being claims that you made against Whiting-Turner or its bonding company under the Miller Act?
>
> Mr. Kirwan: On the combo?
>
> Q: On the Combo Fire project?
>
> A: I believe so, yes.
>
> Q: What are the other events or notices that you're referring to?

A: The event of CHEROKE-98.

Q: Number 98 in Exhibit A?

A: That's correct. Being brought to my attention that Capital City Concrete was paid the monies for our work which we have not received on that project, and this document, unbeknownst to me, which I have never seen before this day, had my signature on it with my name misspelled.

(**Exhibit F** at line 5 on p 32 through line 1 on p.35)

After discussion about the document identified by Mr. Fresolone, the Lien Waiver, Mr. Fresolone testified as follows:

Q: Other than the partial waiver and release document at CHEROKE-98 in Exhibit A, other than the letters we addressed as part of Exhibit A and other than the oral communications that you've already addressed in this deposition that occurred in January, February and March of 2005, were there any other notices to Whiting-Turner or its bonding company that you were going to bring a claim under the Miller Act regarding the Combo Fire project?

A: I don't believe so.

(**Exhibit F** at line 25 on p. 34 through line 10 on p.35).

The deposition ended shortly thereafter. As the deposition testimony cited above indicates, Mr. Fresolone was asked two consecutive "catch all" questions at the end of his deposition, allowing him the opportunities to identify any other events or writings that he would construe as providing notice to St. Paul or Whiting-Turner of Cherokee's intent to assert a direct claim under the Miller Act. In response to these questions, Mr. Fresolone had the unfettered opportunity to identify and describe each and every event cited in paragraph 20 of his submitted affidavit, but failed to do so. He also had the opportunity to testify as to the many additional specific details included in his affidavit. Competent counsel was present with Mr. Fresolone on the day of his deposition, and no request for clarification of the two questions cited above came

from either Mr. Fresolone[4] or his counsel. Further, attending counsel did not object to either of the above two questions, nor file a Motion to Strike after the deposition's conclusion. Mr. Fresolone did not request revision of the above testimony in the weeks following his deposition.

In addition to the testimony cited above, Mr. Fresolone testified as follows:

Q: During that conversation in January of '05, did you tell Mr. Natale that Cherokee may be asserting a direct claim against Whiting-Turner or Whiting-Turner's bonding company?

A: No, not at that time.

(**Exhibit F** at lines 8 through 12 on page 14).

Further, Mr. Fresolone was afforded ample opportunity to testify about any conversations occurring in January or February of 2005, other than the one described above, during the middle portion of his deposition, transcribed on pages 14 through 17 of **Exhibit F**. Although he offered a small amount of detail on two February 2005 conversations, Mr. Fresolone failed to testify with the same specificity in his affidavit as to his February 2005 conversations with Whiting-Turner personnel, and did not identify any of the events listed in Paragraph 20 of his June 18, 2007 Affidavit.

At paragraph 10 of his filed Affidavit, Mr. Fresolone states that "in a number of different conversations during February 2005 . . . I made it clear to Mr. Natale that I wanted the payment bonding information for the project and that Cherokee intended to secure payment of the unpaid invoice . . . from Whiting-Turner or the payment bond, if payment was not forthcoming from Capital City Concrete." Yet, when afforded the opportunity to testify about any February 2005 conversations that he had with Mr. Natale at his deposition, Mr. Fresolone could only recall a specific conversation with Mr. Natale in which he voiced concern over whether the problems

[4] At page 4, lines 15 through 19 of Exhibit A, Mr. Fresolone testified as follows: Q: I would also ask you to agree if I ask you a question and you don't ask me to rephrase or restate it, you, therefore, understand the question? A:

that Cherokee was having with Cap City would slow the U.S. Navy's Child Development Center project (a project on which Cherokee was a direct subcontractor to Whiting-Turner), and another specific instance of his discussion concerning the Lien Waiver, but not the specific assertions contained in paragraph 10 or 20 of his Affidavit. **Exhibit F** at line 20 on p. 14 through line 12 on p. 17. Further, in contradiction to paragraph 12 of Mr. Fresolone's Affidavit, Mr. Fresolone never mentioned the presentation of an unpaid invoice to any Whiting-Turner employee or principal during February of 2005 during his deposition, nor did he testify as to any "acceptance" by Whiting-Turner of his portrayal of the Cap City / Cherokee dispute. See id. at line 20 on p. 14 through line 12 on p. 17.

Further, Mr. Fresolone's admissions in the Providence Action, as cited above, conflict or undermine several paragraphs from his recent affidavit, including paragraphs 7, 11, 16, and 18.

Therefore, St. Paul respectfully urges this Court to disregard Lou Fresolone's Affidavit, which was executed after the filing of St. Paul's Motion for Partial Summary Judgment, created for the sole purpose of opposing that Motion, and is contradictory to Mr. Fresolone's earlier testimony.

**The caselaw that Cherokee cites in its Opposition is ineffective and distinguishable**

St. Paul primarily relies upon the arguments of law contained in its filed Memorandum of Law, which Cherokee has failed to rebut in its Opposition. Below, St. Paul addresses the limited number of cases relied upon by Cherokee.

St. Paul has already demonstrated that the Water Works Supply Corp. v. George Hyman Construction Co., 131 F.3d 28 (1st Cir 1997) does not assist Cherokee in its attempt to avoid partial summary judgment, and that the Water Works opinion, if probative in this matter at all,

---

Fine. Yes.

supports the grant of partial summary judgment in this matter. If anything, the Water Works holding that the oral and written exchanges that may form a composite Miller Act notice must "make it unambiguously clear" that the second-tier subcontractor is seeking payment from the general contractor effectively closes the door on Cherokee's convoluted attempt to avoid summary judgment, especially in light of the Lien Waiver and Cleared Check, documents which made the facts surrounding the Cap City / Cherokee dispute as of February 17, 2005 highly ambiguous. Id. at 33, citing Consol. Elec. Distribs., Inc. v. Altech, Inc., 929 F.2d 1089, 1092 (5th Cir. 1991)

Cherokee also directly cites to Altech, which is distinguishable from the instant action. The Altech court held that sufficient notice was given for a Miller act claim based on the following facts: (1) a representative of a second-tier contractor presented the general contractor with unpaid invoices and orally demanded payment for those invoices within the ninety-day notice period, and (2) the general contractor then wrote a letter, still within the 90-day notice period, to the second tier subcontractor acknowledging that the invoices were for materials used on the subject project. See id. at 1091. Cherokee attempts to analogize this fact pattern with the instant action. That analogy fails for the following reasons: (1) the only "evidence" attesting to a presentation of invoices to Whiting-Turner within the ninety-day Miller Act notice period is from Mr. Fresolone's contradictory affidavit[5], which should be disregarded, (2) no writing created by any party or served within the ninety-day notice period confirmed Whiting-Turner's or St. Paul's receipt of any Cherokee invoice within that notice period, (3) prior to the end of the ninety-day Miller Act notice period, Whiting-Turner was already in possession of the Lien Waiver and the Cleared Check, and (4) Cherokee and Mr. Fresolone later admit in pleadings in

the Providence Action that Cherokee had indeed received a $28,000 payment from Cap City in January of 2005. Mr. Fresolone has already testified, and has re-confirmed in his affidavit, that he could not recall whether he verbally informed Whiting-Turner of Cherokee's intent to assert a direct claim against Whiting-Turner or St. Paul in February or March of 2005. See **Exhibit F** at line 25 of p. 24 through line 18 of p. 25, and Affidavit of Louis Fresolone at ¶ 21 ("I testified that it was probably in February or March that I provided verbal notice of Cherokee's intent to bring a bond claim suit, but I was not sure if that occurred in February or March."). On the other hand, a properly and concisely drafted notice letter from Cherokee, sufficiently served within the ninety-day notice period, would have indeed clarified the situation and put Whiting-Turner and St. Paul on notice that Cherokee indeed intended to assert a direct claim under the Miller Act. "Written notice must be given by the supplier to the contractor in such a manner that it is obvious that the supplier is looking to the contractor for payment." Flow Engineering, Inc. v. Continental Casualty Co., 195 F. Supp. 177, 179 (D.N.J. 1961).

Trane, 217 F.2d 727, is also distinguishable. As Cherokee acknowledges in its opposition, Whiting-Turner has never admitted financial responsibility to pay for Cherokee's claims because it already paid Cap City for those claims in December of 2004. Whiting-Turner did not and would not acknowledge that it had to pay Cherokee *again* for the same work. Under Trane, the Miller Act notice requirement is satisfied when "the proof shows convincingly that knowledge is brought home to the principal contractor." 217 F.2d at 729. Here, the dearth of "proof" upon which Cherokee relies, in the face of the totality of the facts and Cherokee's later admissions in the Providence Action, does not come close to "convincingly" demonstrating that Whiting-Turner or St. Paul possessed the "knowledge," prior to February 17, 2005, that

---

[5] The February 20, 2005 mentions Cherokee's invoices, but does not confirm that Whiting-Turner either reviewed

Cherokee was going to assert a Miller Act claim seeking a double-dip payment from Whiting-Turner or its bond. Again, the only knowledge that was "brought home" to Whiting-Turner prior to February 17 was that a unique dispute existed between Cherokee and Cap City implicating fraud and forgery.

However, Cherokee's version of the facts in this matter is directly analogous to Acme Transfer & Trucking Company v. H.S. Kaiser, Inc., 270 F.Supp. 215 (E.D. Wis. 1967), which held that a second tier subcontractor representative who met with a general contractor and gave verbal notice of claim while at the same time showing the general contractor the unpaid invoices, but did not present a written claim in any form until after the ninety-day notice period expired, did not satisfy the Miller Act notice requirement. Kinlau Sheet Metal Works, Inc. v. Great American Insurance Co., 537 F.2d 222 (5th Cir. 1976) also features facts similar to the instant action, as alleged by Cherokee. In Kinlau, the court held that the plaintiff failed to satisfy the Miller Act notice requirement when the plaintiff presented copies of monthly statements and summary sheets showing how much it was owed by the subcontractor to the general contractor, but did not make an oral or written demand on the general contractor within the ninety-day notice period. Id at 224.

When the status of the Cherokee / Cap City dispute was unclear during February 2005, when tort claims between the two were a possibility (and eventually a reality), and when Whiting-Turner had already paid Cherokee for the remainder of its work on the Combo Fire Project, specific and timely notice from Cherokee that it was looking to Whiting-Turner for payment was necessary. See Light & Power Utilities v. Liles Construction Co., 440 F.2d 474, 478 (5th Cir. 1971). ("Contractors should not be compelled to wait around with their liabilities

---

or received them, and cites the incorrect amount of the money claimed by Cherokee.

unknown or unsettled for an indefinite length of time . . . the statute specifically requires formal notice, in writing. What the contractor may have been told, or heard, is insufficient.”). Considering the circumstances, prompt and clear notice of Cherokee’s specific claim against Whiting-Turner or St. Paul was necessary in order to “bring home” the understanding that Cherokee was actually going to look towards Whiting-Turner’s bond for payment, despite of and in addition to allegations of forgery and fraud against Cap City, and that Whiting-Turner might have to have been in danger of paying twice for Cherokee’s work on the Combo Fire Project. See J.A. Edwards v. Thompson Construction Corp., 273 F.2d 873, 875-876 (2nd Cir. 1959) (“A statute which gave rights on the contractor’s bond to laborers and materialmen having no contractual relations with him but which did not require timely and adequate notice to him, would lead either to double payments or interminable delay”). In the face of uncertain facts from which different implications could have been drawn, specific written notice from Cherokee was required within the mandatory notice period to provide clarity, as “the need for exercising imagination was what the notice provision of the Miler Act was intended to prevent.” Id. at 877.

**Conclusion and Request for Attorney’s Fees**

St. Paul’s Motion for Partial Summary Judgment should be granted based on the grounds set forth in its initial Memorandum in support of that motion, and the arguments in Cherokee’s Objection should be summarily dismissed for the reasons stated above. Further, in light of Cherokee’s admission in the Providence Action of the receipt and deposit of a check from Cap City, with the notation of “Slab – FPS Bldg. (partial)” in the amount of $28,000, representing payment for most of Cherokee’s work on the Combo Fire Project, an admission that directly contradicts Cherokee’s position throughout the instant action that it had not been paid at all for its $33,284.20 claim on the Combo Fire Project, St. Paul respectfully requests that this

Honorable Court award it all of its reasonable attorneys' fees incurred in the filing of its Motion for Partial Summary Judgment and Reply Brief, based on Cherokee's failure to maintain proper candor in front of this Court and wasting St. Paul's and this Court's time, energy, and resources.

Respectfully submitted,

St. Paul Fire & Marine
Insurance Company,
By its Attorneys,

/s/ Michael D. Williams

Christopher C. Whitney (#3261)
cwhitney@lmkbw.com
Michael D. Williams (#6702)
mwilliams@lmkbw.com
Little Medeiros Kinder
Bulman & Whitney, P.C.
72 Pine Street
Providence, RI 02903
T: (401) 272-8080

Dated: July 13, 2007

**CERTIFICATION**

I, Michael D. Williams, hereby certify that on the 13th day of July, 2007, I caused to be emailed a copy of this Reply Brief to the attention of Charles S. Kirwan, Esq.

/s/ Michael D. Williams

f:\mdw\st. paul\whiting - turner\cherokee action\motion for partial summary judgment\reply brief - final.doc