# EXHIBIT F

UNITED STATES OF AMERICA
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA for the use and benefit of CONCRETE PLACEMENT, INC. and CHEROKEE CONSTRUCTION, INC.

VS. C.A. NO. 05-480S

ST. PAUL FIRE & MARINE INSURANCE CO.

DEPOSITION OF LOUIS FRESOLONE, CHEROKEE CONSTRUCTION, a Plaintiff in the above entitled cause, taken on behalf of the Defendant, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the offices of Little Medeiros Kinder Bulman & Whitney, PC, 72 Pine Street, Providence, Rhode Island, on January 11, 2007, at 2:50 P.M.

APPEARANCES:

FOR THE PLAINTIFFS......CHARLES S. KIRWAN & ASSOCIATES
BY: CHARLES S. KIRWAN, ESQUIRE

FOR THE DEFENDANT.......LITTLE MEDEIROS KINDER BULMAN & WHITNEY, PC
BY: MICHAEL D. WILLIAMS, ESQ.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

I N D E X


| WITNESS | PAGE |
|---|---|
| LOUIS FRESOLONE | |
| EXAMINATION BY MR. WILLIAMS | 3 |


E X H I B I T S

(DEFENDANT'S)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| A | MEMO TO NATALE FROM RICCI, 3-2-05, WITH ATTACHMENTS, 7 PGS | 18 |


FOR INSTRUCTIONS TO WITNESS, SEE PAGE 34

(DEPOSITION COMMENCED AT 2:50 P.M.)

LOUIS FRESOLONE

Being duly sworn, deposes and testifies as follows:

THE REPORTER: Would you state your full name for the record, please.

THE WITNESS: Louis Fresolone.

MR. WILLIAMS: Before I start, Attorney Kirwan, we'll agree to the stipulations we agreed to prior to in the previous deposition?

MR. KIRWAN: Yes, sir.

EXAMINATION BY MR. WILLIAMS

Q. Mr. Fresolone, my name is Michael Williams, I'll be asking you a few questions today. I think your attorney will agree you're here on behalf of a Rule 30(b)(6) deposition served on Cherokee Construction, correct?

MR. KIRWAN: Say yes.

A. Yes.

MR. WILLIAMS: Either one of you. I don't care which one.

Q. Are you under the influence of any substance today that may impair your testimony?

A. No.

Q. Have you ever been deposed before?

A. Yes.

Q. How many times?
A. Twice, I believe.
Q. You were present in the room during the previous deposition of Mr. LaFazia, correct?
A. Yes.
Q. So you're aware that I'd like you to answer the questions with words and not uh-huhs or shaking of the head or anything like that; you understand that, right?
A. Yes, I do, Mike.
Q. I would ask you, like I asked him, to go ahead, and feel free to ask for a break, we'll wait until the question is answered; can we agree to that?
A. That's fine, yes.
Q. I would also ask you to agree if I ask you a question and you don't ask me to rephrase or restate it, you, therefore, understand the question?
A. Fine. Yes.
Q. Okay. What's your address?
THE WITNESS: Business or home?
MR. WILLIAMS: Business address is fine.
A. Business address is 855B Atwood Avenue, Cranston, Rhode Island.

Q. Who is your current employer?
A. Cherokee Construction, Incorporated.
Q. What's your position within that company?
A. I'm an owner and vice president.
Q. You're an owner, so there a few owners, or are you the only owner?
MR. KIRWAN: We'll object to that question.
THE WITNESS: We'll object to that.
MR. KIRWAN: If we can keep going.
Q. Is that too difficult to explain, not enough time to answer; is it --
A. Yes.
Q. Is it a Rhode Island incorporated entity?
A. Yes, it is.
Q. How long have you been with Cherokee?
A. 24 years.
Q. Have you been an owner of Cherokee for those 24 years?
A. Yes, I have.
Q. Have you been a vice president for those 24 years?
A. Yes, I have.
Q. What were you doing before the 24 years with Cherokee?
A. I was in the construction field.

Q. About how many years were you in the construction field prior to joining Cherokee?
A. Ten.
Q. What kind of work does Cherokee do?
A. Basically, concrete flat work.
Q. Is Cherokee experienced with doing work on government sites such as the U.S. Naval Base?
A. Yes, it is.
Q. Are you familiar at all with the project called the United States Navy's Combo Fire/Police and Gate project?
A. Yes, I am.
Q. How are you familiar with that?
A. I was a subcontractor, Cherokee Construction was a subcontractor for Capital City Concrete.
Q. Did you have a written contract -- did Cherokee have a written contract with Capital City Concrete?
A. I don't recall whether it was written or verbal.
Q. Is there any way to check your records to see if there is a written contract between Cherokee and Capital City?
A. Yes, I could.
Q. I'd ask you, sir, to check the records, and I

would also ask you if you do find the contract to produce it to your counsel, and if you do not find a contract, to ask your counsel to inform me that you could not find it.
A. Yes.
Q. What was your personal involvement with the Combo Fire project? By the way, I'm sure you don't mind if I'm going to refer to it as the Combo Fire project, it has a long enough actual name.
A. That's right.
Q. What was your personal involvement with the Combo Fire project?
A. We were to place concrete flat work slabs.
Q. Was that the extent of Cherokee's role on that project?
A. Yes, it was.
Q. Is Capital City the organization that asked you to do that work?
A. Yes.
Q. I understand that there's an active dispute between Cherokee and Capital City, I'm not going to go into that because the purpose of this deposition is limited only to the topic of notice under the Miller Act, so I will proceed under that. Are you aware of a company called the

Whiting-Turner Contracting Company?
A. Yes, I am.
Q. How are you aware of that company?
A. Doing the projects of the Gates project and child day care.
Q. Otherwise referred to as the CDC project?
A. That's correct.
Q. Is there any other involvement or interaction with Whiting-Turner other than those two projects?
A. No.
Q. You haven't had any other involvement after those projects?
A. No.
Q. Do you know what the statute popularly referred to as the Miller Act is?
A. Yes.
Q. What's your understanding of that statute, I know you're not an attorney, but what's your understanding of the Miller Act?
A. That as a contractor doing work, performing work on that so-called project in a timely manner and fashion to seek payment for work that was performed.
Q. Are you aware of any requirements to prevent -- present notice for payment under the Miller Act?

THE WITNESS: Can you rephrase that please?

Q. You're familiar with the Miller Act?

A. Yes.

Q. Are you aware of any type of requirement under the Miller Act to present any type of notice for a claim of payment?

A. Yes.

Q. What's your understanding of that requirement for notice under the Miller Act?

A. That within a certain amount of time, I will have to react to a bond claim for lack of payment on work performed on a particular project.

Q. Do you know what the certain amount of time is?

A. I believe it's 90 days.

Q. You believe right. Do you know anything else about the way that you make a claim under the Miller Act other than it has to be within 90 days?

A. No.

Q. Have you ever made a claim under the Miller Act, apart from the Combo Fire project?

A. Child day care, I believe.

Q. You've made a Miller Act claim under the CDC project as well?

A. Correct.

Q. Have you had any verbal communications with anybody from Whiting-Turner?
A. Yes.
Q. Can you please describe those communications; how many did you have, for instance?
A. Numerous.
Q. Numerous. So too many to count?
A. Yes.
Q. Did they occur on a daily basis?
(PAUSE)
A. Rephrase that, please.
MR. WILLIAMS: I was about to rephrase it anyway.
THE WITNESS: The question is vague.
Q. I know I've been in a rush today all day so sometimes I'm going to hit you with a few vague ones. In regards to the Combo Fire project, how many times did you verbally communicate with somebody from Whiting-Turner?
MR. KIRWAN: So, this is about the combo project?
MR. WILLIAMS: Right. Talking about Combo Fire here.
A. Combo Fire project, I would have daily communication with a representative from

Whiting-Turner.
Q. Was it always the same representative from Whiting-Turner?
A. No.
Q. Do you remember some of the names of the people who you communicated with from Whiting-Turner?
MR. KIRWAN: Why don't you say this, until you say something else, he's just talking about the Combo Gates project.
MR. WILLIAMS: Right.
THE WITNESS: You're bouncing around.
MR. WILLIAMS: The rest of the deposition is entirely restricted to the combo project.
MR. KIRWAN: He's tricky, Louie. Those vague questions will get you.
Q. Just for the record, and unless I say otherwise, these questions only pertain to the Combo Fire project. So, on the Combo Fire project do you remember any of the names of the Whiting-Turner representatives with whom you verbally communicated with?
A. Mr. Larry Eager, Mr. Andrew Natale, and I believe there was a superintendent for Whiting,

I'm not sure of the gentleman's name.
Q. Now, I asked you about the Miller Act and the Miller Act notice requirements before. In regards to the Combo Fire project, are you aware of the first day that you gave notice to Whiting-Turner that you were going to assert a claim under the Miller Act?
A. I believe it was in January, beginning of January; the date right now is unclear.
Q. This is 2005 or 2006?
A. That would be in 2005, I believe, because the work was performed in '04.
Q. Was this notice verbal or written?
A. Verbal.
Q. Do you remember who you talked to on that day?
A. I believe I spoke to Mr. Andrew Natale.
Q. Do you remember the substance of that conversation?
A. I just asked Andrew if I could have bond information for lack of payment on that project.
Q. When you say lack of payment, what do you mean?
A. Well, the work was performed in November of '04, I believe. January '05, I mean, that's a substantial amount of time to be paid.
Q. Who is responsible for paying you on Combo Fire,

which entity was responsible for paying Cherokee on Combo Fire?
A. Cherokee was a second tier sub for Capital City Concrete.
Q. So it was -- Cherokee was a second tier sub that contracted directly with Capital City Concrete, correct, or were they a second tier sub for Capital City Concrete?
A. Clarify. Cherokee was working for Capital City Concrete.
Q. Directly?
A. Directly.
Q. So, contractually, it was Capital City Concrete who was supposed to be paying Cherokee on the Combo Fire project?
A. Right.
MR. KIRWAN: Objection. You can answer.
MR. KIRWAN: He said yes.
A. Yes.
Q. During that conversation with Mr. Natale in January of '05, you said you asked him for his bond information?
A. I believe I brought it to his attention that we weren't paid on the project, and he spoke to me

about he would look into that.

Q. So in that conversation you informed Mr. Natale that you were not paid on the project and you asked him for the bond information, is that an accurate description of what that conversation contained, in your opinion?

A. I believe so. Yes.

Q. During that conversation in January of '05, did you tell Mr. Natale that Cherokee may be asserting a direct claim against Whiting-Turner or Whiting-Turner's bonding company?

A. No, not at that time.

Q. Moving on from that initial conversation in January 2005. Did you have any other subsequent conversations with either Mr. Natale or anybody else from Whiting-Turner about the fact that you weren't being paid on the project?

THE WITNESS: Would that be prior or after?

Q. After that. It's my assumption that you testified that that was the first time that you provided notice that you had a claim under the Miller Act. I want to know if there were subsequent conversations that you addressed that topic?

A. Yes.

Q. And when did those other conversations occur?
A. I believe it was in February.
Q. Of 2005?
A. Correct.
Q. And who were those conversations with?
A. Andrew Natale, Beth Leslie, and I believe the gentleman's name is Matt Belka (phonetic) for Whiting.
Q. I assume this is more than one conversation that you're referring to in February of 2005?
A. Yes.
Q. If you can, and I don't know if you remember or not, but could you summarize basically, first of all, can you state how many conversations did you have in February of 2005 regarding your intent to bring a claim under the Miller Act?
MR. KIRWAN: Regarding the Combo Gates project?
MR. WILLIAMS: Yes. Every question I ask is on Combo Fire.
Q. Do you know how many different conversations you had in February of '05 with Whiting-Turner personnel?
A. That's tough, that's a tough question because I was involved with the Gates project as a second

tier sub, and at this time in February we were negotiating a contractual deal directly, doing work for Whiting-Turner for the child day care center. So, for me to give you a specific amount of days, Mike, I really couldn't because there were days I was speaking on different issues.

Q. You were dealing directly with Whiting-Turner on the CDC project and then you were also talking to them about Combo Fire as well?

A. That's absolutely correct.

Q. And it's difficult to remember, to set aside which discussion was for what purpose?

A. Yes.

Q. Can you generally summarize what occurred in those discussions in February of 2005 regarding the Combo Fire project that you had with Whiting-Turner?

A. I remember one specific with Andrew Natale asking me, due to the lack of payment at the Gates project, if it would hinder the scheduled work to be done at the child day care center, and I assured him it wouldn't.

Q. Do you remember anything else from those conversations with Whiting-Turner personnel in February 2005 regarding the Combo Fire project?

A. I believe in February it was brought to their attention that a waiver of lien -- well, let me back up one second, please. As I stated, it was -- the Gates project, for lack of payment, I'm negotiating a contract to do work directly for Whiting-Turner on the CDC building. So, in the interim of negotiating for the CDC and talking about scheduling and any such matters, it was brought to my attention that a waiver of lien was signed by myself that said that I was paid for the work that was completed on the Gates project from Capital City Concrete.
Q. I don't want to get too much into that, I know I have you here for a limited purpose, but I understand that waiver of lien that you just described is the heart of another lawsuit that's currently active, correct?
A. Yes.
Q. And that's in Providence Superior Court, correct?
A. I believe so, yes.
Q. I don't want to get too far into that.
A. We're running in conjunction here. The trains are coming down the track side-by-side.
Q. I understand that. I'll call you in again and we can get into that in bloody detail.

A. It seems you're trying to make it gray --

MR. KIRWAN: Don't debate. Let him ask the question. Your job is to answer his questions as accurately as you can.

Q. Now do you remember the last day that Cherokee performed work on the Combo Fire project?

A. I believe it was November 18th of 2004.

Q. Do you have any document that can confirm that that was the last day that Cherokee performed work on that Combo Fire project?

A. Yes.

MR. WILLIAMS: I asked for your production of that document through your counsel.

THE WITNESS: Yes.

MR. WILLIAMS: Thank you.

MR. KIRWAN: We also ask that you produce the certified payrolls you have from Cherokee's work in November '04. I should have pressed that sooner.

MR. WILLIAMS: I will do that.

(DEFENDANT'S EXHIBIT A MARKED FOR IDENTIFICATION)

Q. I'm going to put in front of you what has been marked as Defendant's Exhibit A, there's multiple pages in Exhibit A and they are actually a few

different documents.

MR. KIRWAN: It looks fine.

Q. I'm going to ask you about separate pages of this document. I'm going to ask, can you -- first of all, about the first page. The first page of Exhibit A is what looks to be a memorandum from Joe Ricci to Andrew Natale dated March 2, 2005 regarding the Newport Navy Consolidated Police and Secure Facility Concrete flatwork, that's the subject of the memorandum. It has a Bates stamp of CHEROKEE-20 in the bottom right-hand corner. Are you familiar with that, Mr. Fresolone?

A. Yes.

Q. Have you seen that document before?

A. Yes.

Q. When have you seen it, outside of any discussions with counsel?

A. I wrote it.

Q. You wrote it. So it is signed by you at the bottom, correct?

A. That's correct.

Q. Is that your actual signature?

A. Yes, it is.

Q. So it's not from Joe Ricci, that was a fragment from another memorandum, perhaps?

A. Could be.
Q. Now, why did you write this -- actually, before I go on, could you please describe this memorandum? Was it a fax memorandum, was it mailed? Do you recall?
A. I believe this is faxed.
Q. Was it also mailed or only faxed?
A. I want to say it was just faxed, I'm not positive to that fact.
Q. Is this a single page document?
A. Yes, I believe so.
Q. There's only one page to it despite the fact that there are other pages to Exhibit A. Can you please describe why you wrote this memorandum?
A. Lack of payment.
Q. Was this memorandum served on Whiting-Turner via certified mail?
A. I'm not positive of that.
Q. Was this memorandum served on Whiting-Turner return receipt?
A. I'm not positive of that.
Q. Is there any way you can confirm whether it was served either certified mail or return receipt on Whiting-Turner?
A. I could check.

Q. I would ask you to check, and if you do find any evidence that it was served in that method to produce it to your counsel, and I would ask your counsel to produce it to me. Is that okay?
A. That's fine.
Q. Thank you. There's a signature below your signature on this March 2nd, memorandum. Can you please describe what that is?
A. That is by notary public, Ms. Desiree Szarwak.
Q. Could you spell her name, please?
A. S-z-a-r-w-a-k.
Q. How do you spell her first name?
A. D-e-s-i-r-e-e.
Q. Two Es, okay. And is it true that when you signed this document she notarized your signature prior to you sending it to Whiting-Turner?
A. Yes.
Q. Why did you have it notarized?
A. Because she's a notary and she worked for the corporation.
Q. Is it something you usually do, do you usually have your signature notarized when you send out a letter?
A. Sometimes, yes.

Q. Why in some situations would you have it notarized and other situations you wouldn't?
A. It all depends what the circumstance calls for.
Q. Why do you feel the circumstance behind writing this letter called for a notarized signature?
A. $35,000 of completed work.
Q. Understood. I'd like to move on to the second and third page of Exhibit A, it's a March 25th letter from --
MR. KIRWAN: Can we go off the record for a second?
MR. WILLIAMS: Absolutely.
(OFF THE RECORD)
MR. WILLIAMS: We'll go back on the record. We just removed when we were off the record a few pages from Exhibit A because it contains duplicative pages of other pages that are later on in Exhibit A.
Q. So, Mr. Fresolone, I'd like you to turn to the pages marked in the bottom right-hand corner as CHEROKEE-96 and also 97, 98, 99 and 100. Those are all part of the same -- those are related to the same document. The one marked with 96 in the bottom right-hand corner is a letter dated March

25th, 2005 from Charles S. Kirwan to Andrew Natale; Number 98 is a document entitled Partial Waiver and Release For Second Tier Subcontractors and Suppliers, which I do believe was attached to the March 25th, 2005 letter, and document bearing the number 99 in the bottom right-hand corner is a certified mail receipt; and the document bears the number 100 in the bottom right-hand corner is the return receipt which appears to be signed by somebody at Whiting-Turner on a date of, I believe that says March -- I'm not really sure what date that says, unfortunately. I think it says April 20th; it's difficult to read.

MR. KIRWAN: I think we can probably stipulate, I believe that it's 4-20.

Q. Mr. Kirwan received it originally, so we can stipulate to April 20th. Mr. Fresolone, have you seen this letter before?

A. Yes.

Q. Outside of any discussions with counsel regarding the case that we're here for, when have you seen this?

A. This was brought to my attention. I wrote some of this with my counsel at that time.

Q. At that time, meaning around the date of March 25,

2005? I assume it would be before that date.
A. It would be before that, just prior to.
Q. The week leading up to it, perhaps?
A. Perhaps.
Q. Now, without getting into anything that you may have discussed with your counsel, did you -- do you understand what the reason was behind sending this letter?
A. The reason for this was acting on the Miller Act bond for lack of payment on that project.
Q. Before you sent this letter, and not including any of the conversations that we've addressed that occurred in January and February of 2005, did you have any conversations with Whiting-Turner in March of 2005 before you sent this letter -- I'm sorry, before your counsel sent this letter?
A. I believe so.
Q. Do you remember the substance of those conversations?
A. No, I don't.
Q. Do you remember how many you may have had regarding the Combo Fire project?
A. No, I don't. Because it was running in conjunction with the child day care project.
Q. Before the date of this letter, March 25, 2005,

did you verbally inform Whiting-Turner that you were going to bring a lawsuit against either them or their bonding company?

A. I believe so, yes.

Q. Do you remember when you did that?

A. It was probably around that time of February or March.

Q. But you're not sure whether it occurred in February or March?

A. No, I'm not because, like I said, we were working in conjunction strictly for Whiting-Turner on child day care and this had to do with work performed as a second tier sub on the Gates project.

Q. Do you have any kind of records or internal memorandum that keep track of the conversations that you had with Whiting-Turner on Combo Fire?

A. No.

Q. The lien, the partial waiver and release that has the number 98 in the bottom right-hand corner Bates stamped, do you under -- is it your understanding that partial waiver and release was included with the March 25, 2005 letter?

A. Yes.

Q. And is this the document that you were referring

to earlier on in your testimony?

MR. KIRWAN: The waiver you were referring to?

A. Yes.

Q. I understand there's some dispute as to the accuracy of your signature on this partial waiver and release, correct?

A. That's correct.

Q. You said you assisted your counsel in writing part of this letter, without getting into any kind of direct communications with your counsel, can you please inform me as to what parts of the letter you assisted with?

MR. KIRWAN: I'm going to object. It was based on what he already said, it was a joint effort. I think it's very hard for you to ask questions without invading the privilege. If you want to take a break and talk about it, or if you want to refine a few questions, but I don't want to waive the privilege.

Q. I understand that. Let me try this question then.

MR. KIRWAN: I just want to instruct Mr. Fresolone to slow down on the topic of anything that may pertain to attorney/client communications so I have an opportunity to object.

MR. WILLIAMS: Fair enough.
Q. In the March 25, 2005 letter that's in front of you, is it a fair statement that, Mr. Fresolone, you're unable to discern what content you contributed to the letter?
MR. KIRWAN: I'm going to object. It was a joint effort, and I think it's going to be very hard to ask and answer questions without waiving the privilege as to who contributed what.
Q. Mr. Fresolone, did you receive any type of response to Mr. Kirwan's letter, did you personally receive any kind of response, either written or oral?
MR. KIRWAN: From Whiting-Turner?
MR. WILLIAMS: Yes, from Whiting-Turner.
THE WITNESS: Could you kind of clarify that question, it's a little gray to me?
Q. The letter is addressed to Mr. Andrew Natale Whiting-Turner, correct?
A. That's correct.
Q. I'm asking you whether anybody from Whiting-Turner, whether it was Mr. Natale or not, responded to this letter either in writing or orally?

A. I believe so, yes.
Q. How did they respond?
A. I believe it was verbal communication.
Q. So, Mr. Natale spoke with you about this letter on the project after it was sent, is that accurate?
A. I'd say it was Mr. Natale, yes.
Q. And soon after this letter was sent, was there any kind of -- strike that question, please. I want to turn to the second page of Exhibit A, it's dated April 13, 2005.
MR. KIRWAN: No, CHEROKE-95.
Q. CHEROKE-95, Bates stamp in the bottom right-hand corner, do you see that letter, Mr. Fresolone?
A. Yes.
Q. Are you familiar with this document?
A. Yes.
Q. Are you familiar with it outside your communications with your counsel in preparation for this lawsuit?
A. Yes.
Q. When did you first see this document?
A. Right around that time.
Q. Right around April 13th?
A. Yes.
Q. Now I know you can't go inside of your counsel's

head, but do you have any reason -- do you know why this letter was sent dated April 13, 2005, without testifying as to any communications you had with your counsel?

A. To act on payment that should be received for work that was completed on that project.

Q. So, as of April 13, 2005, you hadn't received any additional payment on the Combo Fire project?

A. That is correct.

Q. Can I assume that you did not receive any other type of satisfactory response from Whiting-Turner in reaction to the March 25th letter?

A. Yes, that's correct.

Q. And does this April 13th, 2005 letter forward the March 25th, 2005 letter to Mr. Andrew Natale?

A. I don't believe so. I believe March is before April. Correct?

Q. Yes. I'm asking you, this letter reads, and correct me if I'm wrong, attached is a copy of a letter that I faxed to you on March 25th, 2005 on behalf of Cherokee Construction, Incorporated, regarding the above-referenced Miller Act project and above that you reference the Combo Fire project. This letter forwards the March 25th, 2005 letter to Whiting-Turner to Mr. Natale again,

correct?

MR. KIRWAN: It attaches the letter.

Q. Or it attaches the letter, maybe I'm using different terminology than you're comfortable with.

A. I'm sorry, I'm not quite sure of the question. Mike, excuse me one second. March is before April, if that's what you're asking.

Q. Right. What's the purpose of this letter as you look at it, or as you recall, what's the purpose of this April 13, 2005 letter?

THE WITNESS: What is the purpose?

Q. What was the purpose when it was sent?

A. To reassure them that on March 25th, thereabouts, that letter was sent to, addressed to Mr. Natale.

Q. Okay. So you weren't sure whether Mr. Natale received that March 25th letter?

MR. KIRWAN: Objection. Go ahead.

A. That is correct.

Q. Is there any other reason why this April 13th mailing was sent?

A. I guess he didn't respond to the 25th -- March 25th letter. That's why the 13th was sent.

Q. As I look at the documents that are Bates stamped

number 99 and number 100, CHEROKE-99 and CHEROKE-100 that's also part of Exhibit A. I see on the certified mail receipt the date of April 13, 2005. I mistakenly associated with the March 25th letter, but apparently it looks like it was sent with the April 13th letter, and as Mr. Kirwan pointed out, the difficult to read date on the return receipt is likely April 20th which is at CHEROKE-100.

MR. KIRWAN: I think that's what it says. That copy is very hard to read.

MR. WILLIAMS: We're willing to stipulate, I know we can obtain a better copy that that says April 20th at CHEROKE-100.

Q. So, Mr. Fresolone, it appears that the document -- copies in this packet, the certified mail receipt at CHEROKE-99 and the return receipt at CHEROKE-100 went along with that April 13, 2005 mailing; is that accurate?

A. That's what document 99 states, I'd have to believe so.

Q. Is it anywhere in your records or if you can ask your attorney if it's in his records, whether there are any return receipts for the March 25, 2005 letter?

MR. KIRWAN: We'll stipulate that there aren't.

MR. WILLIAMS: All right, we can stipulate to that.

Q. Okay. Mr. Fresolone, other than what's been put in front of you today, and other than what you've told me in terms of your verbal communications with Whiting-Turner in January, February and March 2005, any or all of which may be Whiting-Turner claims or may not be, are there any other events, either written or oral, that you would assert as being claims that you made against Whiting-Turner or its bonding company under the Miller Act?

MR. KIRWAN: On the combo?

Q. On the Combo Fire project?

A. I believe so, yes.

Q. What are the other events or notices that you're referring to?

A. The event of CHEROKE-98.

Q. Number 98 in Exhibit A?

A. That's correct. Being brought to my attention that Capital City Concrete was paid the monies for our work which we have not received on that project, and this document, unbeknownst to me, which I have never seen before this day, had

my signature on it with my name misspelled.

Q. And just to refresh my own memory, you first saw the document at Number 98 the partial waiver and release, in January of 2005?

A. No. No. I believe the document was presented to me in February of 2005.

Q. So you believe you first saw the document that's at Number 98, the partial waiver and release document, that you testified does not actually bear your authentic signature, in February of 2005?

A. Yes.

Q. Who provided the partial waiver and release, CHEROKE-98 that's in front of you right now, to you, who first provided that to you?

A. Mr. Andrew Natale.

Q. I believe you told us that already. Now, did he say anything when he provided that to you?

A. He just stated that he had a waiver of lien signed by myself.

Q. Was that in response to your oral demand for payment that he presented you with a partial waiver and release?

A. Yes.

Q. When you first saw this document, what did you do?

A. I laughed.
Q. Then what did you do?
A. I explained to Mr. Natale that, A, I had never seen this document other than him having it physically in front of me and, B, that was not my signature on that document.
Q. Then what did you do after that?
A. He explained to me -- he seemed to be in a nervous state, stating that he didn't know what my signature, how my name was spelled.
Q. Then what happened after that?
A. I asked him for a copy of the document.
Q. Did he give you one?
A. Yes, he did.
Q. Did anything happen after that?
A. No. I believe that was it.
Q. Without getting into communications you had with your counsel, had you already retained counsel in regards to the combo city project?
MR. KIRWAN: Objection. Don't answer it.
(SO NOTED)
Q. That's fine. I withdraw that question. Following up on the question that I got into the topic of this partial waiver and release. Other than the

partial waiver and release document at CHEROKE-98 in Exhibit A, other than the letters we addressed as part of Exhibit A and other than the oral communications that you've already addressed in this deposition that occurred in January, February and March of 2005, were there any other notices to Whiting-Turner or its bonding company that you were going to bring a claim under the Miller Act regarding the Combo Fire project?

A. I don't believe so.

Q. Eventually, the reason why this lawsuit is active today is because you were not paid the money that you were demanding; is that correct?

A. That's correct.

MR. WILLIAMS: I have no other questions in regard to the Miller Act notice. I reserve the right to bring Mr. Fresolone back on other topics.

MR. KIRWAN: I need a quick break.

(RECESS)

THE REPORTER: Do you need a copy of this?

MR. KIRWAN: Yes, I probably need it.

(DEPOSITION CLOSED AT 3:36 P.M.)

C-E-R-T-I-F-I-C-A-T-E

I, LINDA L. GUGLIELMO, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of LOUIS FRESOLONE, a Plaintiff in the above-entitled cause, was taken before me on behalf of the Defendant at the offices of Little Medeiors Kinder Bulman & Whitney, PC, 72 Pine Street, Providence, Rhode Island, on January 11, 2007, at 2:50 P.M. that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5 (d) and 30 (f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Defendant's attorney.

Signature of the witness has been waived by all parties.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of January 2007.

Linda L. Guglielmo Notary Public

LINDA L. GUGLIELMO, NOTARY PUBLIC/RPR-RMR
(MY COMMISSION EXPIRES AUGUST 13, 2009)

Post-it® Fax Note 7671 | # of pages ▸ 1
To [handwritten] | From
Co./Dept. | Co.
Phone # | Phone #
Fax # 727-1257 | Fax #

CHEROKEE CON
48 QUEEN S
CRANSTON, RI 02920
401-464-4577 TELEPHONE & FAX
cherokee4@cox.net

To: Mr. Andrew Natale, Project Manager

From: Joe Ricci

Date: March 2, 2005

Re: Newport Navy Consolidated Fire,
Police & Security Facility Concrete Flatwork

**Andrew, as per our conversion's about November 2004 work completed and accepted at above said building, this letter is a formal way to bring to your attention a lack of payment from your sub-contractor Capitol City Concrete. Cherokee Construction, Inc, would kindly. Request all bonding information on this project to expedite payment due of $35,000.00 for completed work. Thank you for your attention on this matter.**

[signature]
**Lou Fresolone, Vice President**
**Cherokee Construction, Inc.**

[handwritten] 3/2/05 Notary Public
expires 6-28-05

DEFENDANT'S EXHIBIT NO. [handwritten] FOR IDENTIFICATION DATE: [handwritten] RPTR: [handwritten]
PENGAD 800-631-6989

CHEROK-20

ROM : CHEROKEE CONSTRUCTION FAX NO. : TELEPHONE

# CHARLES S. KIRWAN & ASSOCIATES

ATTORNEYS AT LAW
36 PARK PLACE
PAWTUCKET, RHODE ISLAND 02860

CHARLES S. KIRWAN

Tel (401) 722-2500
Fax (401) 727-1256
e-mail kirwanlaw@gis.net

Admitted RI, MA, NJ, DC


April 13, 2005

CERTIFIED MAIL

Mr. Andrew Natale, Project Manager
WHITING TURNER CONTRACTING COMPANY
1297 Bushnell Street
Middletown, R.I. 02842

Re: Cherokee Construction, Inc. and Capital City Concrete, Inc.

| | |
|---|---|
| Bond Principal | Whiting-Turner Contracting Company |
| Bond No. | 104161881 (Travelers Casualty & Surety Company of America) |
| Contract No. | N62477-99-D-0019/0025 Navy Combo Fire Station and Gates Project |
| Subcontractor | Capital City Concrete, Inc. |
| Sub-Subcontractor | Cherokee Construction, Inc. |

MILLER ACT BOND CLAIM NOTICE

Dear Mr. Natale:

Attached is a copy of the letter that I faxed to you on March 25, 2005 on behalf of Cherokee Construction, Inc. regarding the above-referenced Miller Act project.

Very truly yours,

Charles S. Kirwan
Counsel to Cherokee Construction

Attachment

cc: Cherokee Construction

Certified Mail No. 7000 1530 0004 2930 7089

CHARLES S. KIRWAN & ASSOCIATES
ATTORNEYS AT LAW
36 PARK PLACE
PAWTUCKET, RHODE ISLAND 02860

CHARLES S. KIRWAN

Tel (401) 722-2500
Fax (401) 727-1256
e-mail kirwanlaw@gis.net

Admitted RI, MA, NJ, DC

March 25, 2005

VIA TELECOPIER (846-4215)
AND REGISTERED MAIL

Mr. Andrew Natale, Project Manager
WHITING TURNER CONTRACTING COMPANY
1297 Bushnell Street
Middletown, R.I. 02842

Re: Cherokee Construction, Inc. and Capital City Concrete, Inc.

| | |
|---|---|
| Bond Principal | Whiting-Turner Contracting Company |
| Bond No. | 104161881 (Travelers Casualty & Surety Company of America) |
| Contract No. | N62477-99-D-0019/0025 Navy Combo Fire Station and Gates Project |
| Subcontractor | Capital City Concrete, Inc. |
| Sub-Subcontractor | Cherokee Construction, Inc. |

MILLER ACT BOND CLAIM NOTICE
AND REQUEST FOR INFORMATION

Dear Mr. Natale:

The undersigned represents Cherokee Construction, Inc. As Whiting-Turner is aware, Cherokee Construction served as a lower tier subcontractor to your subcontractor, Capital City Concrete with respect to the above referenced Miller Act Navy construction contract ("the Project").

As Mr. Louis Fresolone of Cherokee Construction advised you during the week of January 10, 2005, Capital City Concrete had not made payment to Capital City Concrete in the amount of $33.284.20 for work duly completed by Cherokee Construction with respect to the Project. On January 24, 2005, Mr. Fresolone met with you to attempt to secure payment of the $33,284.20 balance earned by and owed to Cherokee Construction. On February 28, 2005, you continued Whiting-Turner's cooperation with Cherokee Construction by providing Mr. Fresolone a copy of the attached partial waiver and release that names Cherokee Construction and Mr. Fresolone. You advised Mr. Fresolone that Capital City Concrete provided the attached partial waiver and release to Whiting-Turner to secure payment from Whiting-Turner for the Project work duly completed by Cherokee Construction. You will note that the partial waiver and release misspells the name "Fresolone", and, as confirmed by Mr. Fresolone, the notarized signature purporting to be Mr. Fresolone's signature, does not in any respect resemble his own actual signature. On March 18, 2005, Mr. Fresolone again met with you regarding this payment problem at which time you indicated Whiting Turner was indeed holding funds that eventually would be payable to Capital City Concrete. Any such funds should be paid to or held on account for Cherokee Construction until Capital City Concrete pays Cherokee Construction the $33,284.20 balance earned by and owed to Cherokee Construction.

1. At this time demand is made that Whiting-Turner demand and take all steps necessary to secure a written notarized statement from Capital City Concrete to explain to Whiting-Turner who actually signed Mr. Fresolone's name on the attached partial waiver and release. We request a copy from Whiting Turner as soon as Capital City Concrete complies with this requirement.

2. At this time demand is made that Whiting-Turner withhold any payments owed to Capital City Concrete on any project involving Capital City Concrete in an amount sufficient to assure full payment to Cherokee Construction. As we understand it, the standard Whiting-Turner subcontract expressly allows Whiting-Turner the right to set-off and recoup or retain amounts otherwise payable to Capital City Concrete to account for Capital City Concrete's failure or refusal to pay Cherokee Construction on this Project. If Whiting-Turner now has or will have funds otherwise payable to Capital City Concrete up to an including the $33,284.20 owed to Cherokee Construction, demand is made that Whiting-Turner, issue a check to Cherokee Construction and back-charge Capital City Concrete in an equal amount.

3. At this time, Whiting-Turner is also notified of Cherokee Construction's intent to pursue its Miller Act bond claim rights to recover its $33,284.20 project balance from the bond. If Miller Act litigation is required, Cherokee Construction hereby asserts and reserves its right to cover all compensable damages, attorneys fees, pre-judgment interest and court costs.

Cherokee Construction regrets that non-payment by Capital City Concrete forces these demands. Whiting-Turner's continued assistance and cooperation are respectfully requested. Cherokee Construction, Mr. Fresolone and the undersigned thank you for your prompt assistance in helping Cherokee Construction recover the $33,284.20 that it earned on the Project. If Whiting-Turner at any time needs any additional information from Cherokee Construction concerning this matter, then kindly please let me know and we will expedite delivery of the responsive data.

Thank you very much.

Very truly yours,

Charles S. Kirwan
Counsel to Cherokee Construction

Attachment

cc: Cherokee Construction
Capital City Concrete

Registered Mail

THE WHITING-TURNER CONTRACTING COMPANY

EXHIBIT I

## PARTIAL WAIVER AND RELEASE FOR SECOND TIER SUBCONTRACTORS AND SUPPLIERS

The Whiting-Turner Contracting Company *(General Contractor)* DATE: 11-27-04

OWNER: The United States Navy

PROJECT: 10010-Consolidated Fire, Police and Security North Gate and Gate 2

SUBCONTRACTOR: Capital City Concrete Inc.

The undersigned Company, a subcontractor or supplier to the Subcontractor named above, and hereinafter referred to as the "Company", in consideration of payment previously received and in consideration of payment for work performed through the current date set forth below, hereby waives and releases all mechanics', materialmen's, or other liens and, to the fullest extent permitted by law, all rights to file any such liens in the future, and all claims and demands against the Owner, the General Contractor and the real property on which the Project is located, and any claims arising out of work, labor, services, equipment or materials, performed or furnished by the Company, its subcontractors and suppliers, in connection with the Project, through the period covered by the current invoice.

Except as noted below, the Company further acknowledges and represents that all persons and entities which have provided labor or material, or rented equipment, for or through the Company in connection with the Project have been paid in full for the periods covered by previous payments, that the previous payments to the Company have been properly applied to pay all outstanding invoices relating to the Project, that the Company is not aware of any claims, or circumstances which could give rise to future claims, against the Owner, the General Contractor or the Project, and that all payroll, withholding and other taxes, union benefits, insurance premiums or other amounts required by law, regulation or agreement to be paid in connection with labor for the project have been paid in full through the last date of work covered by the current invoice.

List exceptions, if any:

~~10% Retainage~~ None

Last date of work period covered by current Invoice: November Requisition - Invoice I

Cherokee Construction, Inc.
*(Name of Company)*

BY: [signature] V.P.
*Signature, Duly Authorized Agent of Company*

ADDRESS: 48 Queen Street
Cranston, RI 02920

Louis Freselone, Vice President
*Printed Name and Title*

STATE OF Rhode Island )

(CITY) (COUNTY) OF Providence ) ) to wit:

On this 27th day of November, 2004, appeared before me Louis Freselone and he/she made oath in due form of law that the facts, information and representations set forth in the foregoing Company's Partial Waiver and Release, are true and accurate to the best of his/her knowledge, information and belief.

[signature] My commission expires: [illegible]

*Notary Public*

CHEROK-98

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

7004 2930 0003 4089

MIDDLETOWN, RI 02842

| | | |
|---|---|---|
| Postage | $ 0.37 | UNIT ID: 0102 |
| Certified Fee | 2.30 | |
| Return Receipt Fee (Endorsement Required) | 1.75 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | Clerk: KMOCS1 |
| Total Postage & Fees | $ 4.42 | 04/13/05 |

Sent To
MR NATALE WHITING TURNER CONTRACTING
Street, Apt. No.; or PO Box No.
1297 BUSHNELL STREET
City, State, ZIP+4
MIDDLETOWN RI 02842

PS Form 3800, May 2000 See Reverse for Instructions

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

MR. ANDREW NATALE,
PROJECT MANAGER
WHITING - TURNER CONTRACTING COMPANY
1297 BUSHNELL STREET
MIDDLETOWN, RI 02842

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (*Please Print Clearly*)

B. Date of Delivery
5/1/06

C. Signature
X [signature]
☐ Agent
☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number (*Copy from service label*)
7000 1530 0004 2930 7089

PS Form 3811, July 1999 Domestic Return Receipt 102595-00-M-0952

CHEROK-100